INTERCARGO INSURANCE
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–467C.

United States Court of Federal Claims.

Aug. 4, 1998.

L. Graves Stiff, III, Birmingham, AL, for plaintiff.

Andrea I. Kelly, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger and Director David M. Cohen and Assistant Director Anthony H. Anikeeff, for defendant.

## OPINION

LYDON, Senior Judge.

In this contract case, plaintiff, acting as a Miller Act surety for a Government contractor, seeks enforcement of its right of equitable subrogation against the Government as a result of its payment, by way of a settlement under the payment bond it issued to the contractor, to the supplier of specially manufactured materials ordered by the contractor, who never paid said supplier and the materials were never delivered to the work site.

Defendant has moved to dismiss plaintiff's complaint for lack of jurisdiction on two grounds. First, defendant contends that plaintiff, under the facts of this case, does not and cannot establish any right to equitable subrogation and thus no privity exists to support its claim against the Government. Second, defendant argues plaintiff lacks authority to assert any claim on behalf of the contractor. The contractor filed for bankruptcy (Chapter 7) before the dismissal of the contractor's case (No. 94–121C) in this court involving the same contract which underscores this litigation. Accordingly, defendant argues that the Trustee appointed by the bankruptcy court is the sole representative of the contractor's estate and further argues there is no assertion, suggestion, or any intimation that the Trustee abandoned any claim, or cause of action the contractor might have against the Government. On the merits, plaintiff has moved for summary judgment and defendant also has moved, in the alternative, for summary judgment.

## FACTS

The parties have filed a Stipulation of Facts, supported by a Joint Appendix, which are deemed admitted for purposes of resolving the matters at issue as reflected in the briefs of the parties.[1]

On September 24, 1993, the Department of the Army (Army) awarded Contract No. DABT01–93–C–0134 (Contract No. 0134) to Leonard Wills d/b/a Wills Construction Co. (WCC or Contractor) in the amount of $406,619.00. This award was made pursuant to the Small Business Competitiveness Demonstration Program. The contract incorporated by reference a number of Federal Acqui-

---

1. In its motion to dismiss, or in the alternative, its motion for summary judgment, defendant, under RCFC 56(d)(1), filed its Proposed Findings Of Uncontroverted Fact supported by a separate Appendix of documents. In its subsequently filed motion for summary judgment, plaintiff likewise filed its Proposed Findings of Uncontroverted Fact supported by four exhibits attached thereto. Neither party filed a Statement Of Genuine Issues. See RCFC 56(d)(2)(3). Thereafter, by Order dated June 20, 1997, the court after an informal conference with the parties on June 19, 1997, directed them to file a joint stipulation of uncontroverted facts. Pursuant to this Order, the parties, on September 9, 1997, filed a *Stipulation Of Facts*. The court has utilized both the Stipulation and certain proposed findings of uncontroverted fact contained in the parties' RCFC 56(d)(1) submissions, which are considered to be adequately supported, as the basis for its "Facts" statement in the opinion. *See Wirth v. United States*, 36 Fed.Cl. 517, 519, n. 1 (1996).

sition Regulation (FAR) clauses, e.g., Changes, Termination For Convenience, Default, Bankruptcy, Insurance–Work on a Government Installation, Disputes, etc. The *Special Contract Requirements* portion of the contract contained, *inter alia,* the following clause:

10. Preconstruction Conference: A Preconstruction Conference will be scheduled by the Contracting Officer after contract award and prior to the time and date set for commencement of work which will be held at Fort Rucker. At this meeting, the contractor will be oriented with respect to Government procedures and line of authority, as well as contractual, administrative, and construction matters. The contractor is required to furnish a current Certificate of Insurance and a Letter appointing a construction superintendent at the meeting.

The contract required WCC to maintain certain minimum insurance coverage, including workmen's compensation. Indeed, before commencing work the contract required the contractor to certify in writing that the required insurance coverage had been obtained. The *Special Contract Requirements* portion of the contract also required the contractor to obtain performance and payment bonds.

The contract called for the demolition of existing doors and frames and installation of new specified doors and frames in some 204 family housing units at Fort Rucker, Alabama.

Intercargo Insurance Company (plaintiff), a Corporate Surety, issued Miller Act performance and payment bonds to WCC, as Principal, on October 6, 1993.

Following receipt of a Notice to Proceed, issued by the Army on November 18, 1993, WCC sent out on December 13, 1993, its Purchase Order No. 93037001 to H & H Doors and Hardware, Inc. (H & H) for hollow metal doors and frames (all galvanized materials) and related components, i.e., frames, screens, storm doors, louvers, thresholds, weather stripping and door bottoms. The Purchase Order price was $253,000 plus sales tax, "F.O.B. Our Office [WCC's office]." The Purchase Order also

provided in pertinent part, "Please ship the following via Best Way To Job Site. It is agreed that the shipment will be made on or before 1–21–94 or right is reserved to cancel order."

On December 7, 1993, WCC submitted its proposed contract schedule designed to plan performance of the contract work so as to meet the June 16, 1994 contract completion date called for in the contract. The Government accepted this schedule on December 22, 1993.

On December 15, 1993, Maryland Insurance Group notified the Contracting Officer, Betty Ritter, that WCC's insurance coverage regarding the contract for removal of existing doors and frames, etc., would be canceled effective January 14, 1994. This notice did not state the reason for the cancellation.

On December 22, 1993, WCC submitted a request to the Contracting Officer for a progress payment of $8,632.00, and the Contracting Officer approved such a payment to WCC on January 4, 1994. No other request for progress payments was received from WCC prior to termination of the contract by the Army. Plaintiff makes no claim relative to the above progress payment.

On January 4, 1994, H & H issued a Purchase Order to CECO Door Products for various materials required to comply with the terms of its contract with WCC. The scheduled shipping date for these materials was February 18, 1994. By letter dated February 3, 1994, H & H advised WCC that based on shipping dates received from its supplier, H & H anticipated that it would begin shipment of the specified materials to the Fort Rucker job site during the week beginning March 7, 1994. On January 18, 1994, H & H issued a Purchase Order to Falcon Lock Company for various materials needed to comply with the terms of its contract with WCC. The scheduled shipping date for these materials was apparently February 14, 1994.

By letter dated January 25, 1994, the Contracting Officer wrote WCC in pertinent part as follows:

Reference Contract No. DABT01–93–C–0134, Install New Doors and Frames,

Family Housing Areas, Fort Rucker, Alabama.

## CURE NOTICE

You are notified that the Government considers your failure to furnish renewal certificates of insurance (workmen's compensation, general liability, etc.) a condition that is endangering performance of the contract. Therefore, unless this condition is cured within ten (10) days after receipt of this notice, the Government may terminate for default under the terms and conditions of the "Default—Fixed Price Construction" clause of this contract.

If you have any questions, you may contact Fred Witcher at (205) 255–4771.

Plaintiff was sent a copy of this letter.

By letter dated January 28, 1993 (sic) [obviously 1994] WCC wrote Fred Witcher, Directorate of Contracting in pertinent part as follows:

Concerning the conversation between you and I on January 26, 1994 on the above named project, all material has not been received at this time. The information that I am getting from my supplier is that the material necessary to start will not be received until the second week in February. Mr. Witcher at this time we are trying to get a earlier ship date in order to start this project. Also concerning the insurance due for this project, I will contact you on Monday, January 31, 1994.

I will keep you informed concerning this matter.

On February 2, 1994, the Contracting Officer, Betty J. Ritter, wrote WCC in pertinent part as follows:

Copies of all correspondence between you and your supplier regarding the shipping delay must be forwarded to this office as soon as possible. This documentation must be complete and specific in outlining *why* this delay has occurred. If the reason(s) for the delay is (are) not excusable you will have to offer consideration for a time extension. Be advised that, barring modification to the contract, your completion date remains June 16, 1994.

Finally, a response to our cure notice is due February 7, 1994. We did not hear from you on January 31 as promised. Be advised that until proper insurance is obtained the Government reserves all rights as mentioned in the notice.

If you have any questions, you may contact Fred Witcher at (205) 255–3476.

On February 7, 1994, the Contracting Officer received copies of two insurance binders from WCC. These binders indicated that certificates of insurance would be issued when the policy number became known. One of these binders was for automobile liability coverage and covered only a one-month period beginning February 7, 1994, well short of the contract completion date of June 16, 1994. The other binder was for general liability insurance. This policy provided coverage for the same one-month period discussed above, i.e., from February 7, 1994 to March 7, 1994. WCC failed to provide a binder for workmen's compensation coverage in its February 7, 1994 submission.

On February 7, 1994, the Contracting Officer received, by way of facsimile, a copy of a handwritten memo from WCC's insurance agent to WCC stating how much a workmen's compensation insurance policy would cost. This memo was not a policy but merely a premium quote.

On February 9, 1994, the Contracting Officer contacted plaintiff's office and informed plaintiff that the Army was considering terminating WCC's contract for default unless WCC corrected certain insurance notification deficiencies. Plaintiff's office advised it would contact WCC in an attempt to solve the problem. On February 10, 1994, the Contracting Officer was advised by plaintiff's office that it was unable to contact WCC. The Contracting Officer provided plaintiff with WCC's project manager's name and telephone number.

As of February 17, 1994, WCC still had not provided the Contracting Office with proof of workmen's compensation insurance coverage. On February 17, 1994, the Army terminated plaintiff's contract for default (Modification No. P0001). The stated basis for the termination was WCC's alleged failure to comply

with certain provisions of the contract, i.e., a failure to furnish proof of workmen's compensation insurance coverage.

On April 8, 1994, H & H wrote plaintiff as follows:

Dear Sir:

H & H Doors and Hardware, Inc. has a Purchase Order from Wills Construction Co. (P.O. No. 93037001) for the above referenced project.

We have been informed by Betty Ritter, Contracting Officer at Ft. Rucker that they have terminated the contract with Wills Construction.

We have submitted all information on this contract and have approved drawings through Contractor from appropriate Ft. Rucker project manager. We have ordered and received all material.

H & H Doors now has all materials to complete the project. We were also informed by Mrs. Ritter that you have the Surety Bond # 1006980 on this project.

We need to know what process to follow in order to ship the materials to Ft. Rucker. We will supply you with any information necessary so that we may be paid as quickly as possible.

Please contact me at H & H Doors (1–205–793–2528) or the above address as quickly as possible. We would like to know what your intentions are in regard to completion of the job, time frame, etc.

Based upon test results from similar structures at Fort Rucker, which tests were performed on April 14, 1994, the Army determined that completion of the work called for in the WCC contract would require removal of lead-based paint or encapsulation of existing door frames, thus resulting in substantially increased expenditures. The existence of lead-based paint or other hazardous material was one factor in the Government's decision on June 15, 1994 not to re-procure and complete the work called for in the terminated WCC contract. It is important to note that the decision to terminate WCC's contract was made in February 1994 and the tests which uncovered the lead-based paint occurred in April 1994. Obviously, the decision to terminate WCC's contract was not based in any way on the later discovery of the existence of hazardous materials as plaintiff suggests.

There is a dearth of information in the materials supplied by the parties regarding dealings, if any, between plaintiff and H & H and the Army from April 1994 until July 15, 1994.

On July 15, 1994, the Army "de-obligated" the remaining contract balance of $397,-987.00.

H & H, at some time subsequent to April 8, 1994, submitted a claim to plaintiff pursuant to the payment bond plaintiff issued to WCC. There is no evidence that plaintiff contacted the Government and advised it of H & H's claim against plaintiff. Thereafter, H & H and plaintiff entered into a Settlement Agreement wherein plaintiff agreed to pay $150,000 to H & H in exchange for H & H's release and discharge from any and all claims, actions or demands under the payment bond, and further agreed to dismiss any suits filed or commenced against plaintiff. H & H executed the Settlement Agreement on March 29, 1995, which act was notarized on January 13, 1996, or on March 29, 1997, per the Stipulation of Facts (paragraph 14) filed by the parties with this court on September 9, 1997. Plaintiff purportedly signed the Settlement Agreement on April 3, 1995, which act was notarized on April 3, 1995. There is no evidence that WCC ever signed this Agreement. There is no evidence that the Government was contacted by either plaintiff, H & H or WCC at any time prior to execution of this agreement by plaintiff and H & H or that the Government was even aware that the Surety was settling the H & H claim. There is no indication in the materials before the court that plaintiff advised the Army prior to July 15, 1994 that it intended to seek reimbursement from the Army for the $150,000 it paid H & H.

The Settlement Agreement referred to above was initially prepared in March or April 1995 and included, in addition to H & H and plaintiff, WCC, as parties thereto. The Agreement noted that WCC had filed suit in the United States Court of Federal Claims on February 16, 1995 (No. 95–121C) challenging the basis of the default termination

and seeking to convert it into a termination for convenience for recovery of termination costs. Under the "Agreement" WCC agreed to prosecute its claims for recovery of termination costs and related relief as expeditiously as possible. H & H retained the right to seek additional compensation from WCC and to share in any proceeds received as a result the claim asserted by WCC. The Agreement contained provisions regarding the allocation of any proceeds recovered as a result of the litigation referred to above.

In the Court of Federal Claims' litigation (No. 95–121C) referred to above, WCC was represented by attorney John C. McManus of Lackland and McManus, Atlanta, Georgia. WCC and the Government subsequently executed a Settlement Agreement whereby WCC agreed to dismissal of Case No. 95–121C with prejudice and agreed to release the Government from all claims relating to or arising under the WCC contract (No. DABT01–93–C–0134) irrespective of whether the claims were asserted in that action by WCC, in exchange for the Government's conversion of the default termination to one for the convenience of the Government. The Settlement Agreement provided in pertinent part:

> 5. . . . . This settlement provides that no costs whatsoever shall be paid to plaintiff [WCC] related to Contract No. DABT01–93–C–0134 or this settlement. Each party shall bear its own costs and attorneys fees.
>
> * * * *
>
> 9. The conversion of the termination for default to a termination for the convenience of the Government in accordance with paragraph 5 above, shall constitute an accord and satisfaction of all claims, irrespective of whether those claims were asserted in this action, arising under or relating to Contract No. DABT01–93–C–0134.
>
> * * * *
>
> 12. Plaintiff warrants and represents that no other suit or action with respect to claims relating to the contract is pending or will be filed in or submitted to any court, administrative agency, or legislative

body, including, but not limited to, the General Accounting Office. Plaintiff further warrants and represents that it is the sole owner of the claims involved in this case and that it has made no assignment or transfer of all or any part of its rights arising out of the present suit. Should there be any violation of these warranties and representations, the convenience termination shall be cancelled (sic) and the default termination shall be reinstated.

WCC, through its attorney of record, thereafter executed the Settlement Agreement as did the Government's authorized attorneys. The Court of Federal Claims dismissed its complaint in Case No. 95–121 with prejudice on March 25, 1996, pursuant to Rule 41(a)(1)(B), with each party to bear its own costs, attorney fees, and expenses.

Neither the attorney representing WCC in the bankruptcy proceeding, nor the attorney representing WCC before the United States Court of Federal Claims filed a suggestion of bankruptcy in Case No. 95–121C before the court. Nor did Intercargo, plaintiff, seek to intervene in the proceedings before the court although the materials before the court support the view that plaintiff knew the suit was filed in this court.

On August 14, 1995, Leonard Wills, individually and doing business as Wills Construction Co., Inc. and Wills Real Estate Company filed a Petition (Case No. 9541879–JSS–7, U.S. Bankruptcy Court, Northern District of Alabama) for relief pursuant to Chapter 7 of the U.S. Bankruptcy Code. On August 14, 1995, the Bankruptcy Court appointed James G. Henderson as the interim Trustee. On August 29, 1995, the debtor (WCC) filed "the compete lists, inventories and schedules of the debtor and the debtor's estate." The proceeding in the Court of Federal Claims (No. 95–121C) was not listed in these schedules.

On April 6, 1996, Intercargo was added to the list of creditors in the bankruptcy proceeding. Intercargo asserted a claim in the WCC bankruptcy action in the amount of $185,000. On November 12, 1996, the Trustee notified the Bankruptcy Judge that some $93,350.77 were deposited in a Dallas Bank for the Estate of Leonard Wills. The source

of these funds were post-petition insurance monies received by the debtor Leonard Wills.

On November 13, 1996, all creditors in the bankruptcy action were notified as follows:

In the above-styled case, creditors were originally notified that the assets of the estate appeared to be insufficient for the payment of a dividend and that filing of a proof of claim was unnecessary at that time. The case trustee has now notified the court that payment of a dividend appears possible, and the creditors are hereby notified of that fact and that, pursuant to Bankruptcy Rule 3002(c)(5), a creditor must file a proof of claim (if not previously filed) on or before February 11, 1997, in order to participate in any distribution of available funds.

On or about December 10, 1996, plaintiff submitted a proof of claim in the bankruptcy action in the amount of $185,000. In this proof of claim, plaintiff stated the debt it asserted in the proof of claim was incurred on April 3, 1995 and that the basis for its claim was "Exoneration." The claim was labeled an "Unsecured Nonpriority Claim." As of the date of this opinion, the court understands that the bankruptcy proceeding is still pending.

On March 20, 1996, Intercargo filed a complaint "For Reimbursement Of Surety" in the United States District Court for the Northern District of Alabama No. CV–96–PT–0740–E, against WCC and Leonard Wills individually. In its Complaint, Intercargo sought $150,000 reimbursement for monies paid to H & H. In its complaint, plaintiff stated in pertinent part as follows:

\* \* \* \*

3. On October 6, 1993, the defendants, [WCC and Leonard Wills] separately and severally, executed an Agreement of Indemnity (*see* Exhibit "A") under the terms of which said defendants promised to indemnify and hold Intercargo harmless with respect to any loss, cost or expense which might result from the issuance of bonds on behalf of Wills Construction.

4. Intercargo has received a claim against bonds issued on behalf of the principal from H & H Doors and Hardware, Inc. ("H & H"), a supplier for Wills Construction.

5. Intercargo settled the claim of H & H by paying H & H the sum of $150,000.00.

6. Intercargo has requested reimbursement of all losses, costs, and expenses which it has incurred by virtue of the execution of the aforesaid bond on behalf of Wills Construction. The defendants have failed to respond and have otherwise failed to perform their obligations as specified in the Agreement of Indemnity.

\* \* \* \*

On April 3, 1996, Mr. Leonard Wills, in Case No. CV–96–PT–0740–E filed a Suggestion Of Bankruptcy with the United States District Court for the Northern District of Alabama requesting that the case be stayed pursuant to 11 U.S.C. § 362(a). The materials before the court do not indicate whether the stay was granted.

Plaintiff's complaint was filed in this court on August 2, 1996.

## DISCUSSION

### -A-

█ Defendant argues that the complaint in this case, does not properly invoke the court's subject matter jurisdiction, citing RCFC 12(b)(1) and RCFC 12(h)3. Defendant asserts that plaintiff, as a surety, lacks privity of contract with the Government and the court, accordingly, is without jurisdiction to consider plaintiff's claim set forth in its complaint. In its complaint, plaintiff does not allege a contractual relationship with the Government. It does, however, allege a claim for enforcement of plaintiff's surety rights of equitable subrogation.

The complaint alleges that plaintiff issued payment and performance bonds to a Government contractor; that the contractor failed to pay fabricators and material men who were engaged, by purchase orders, to supply material necessary for the performance of the contract; that as a result of the contractor's failure to pay these fabricators and material men, the plaintiff as surety, and in compliance with its obligation under the

payment bond it issued the contractor, paid these fabricators and material men. These allegations set forth a classic case for the assertion by a surety of a claim for equitable subrogation.

Defendant concedes that a surety who had paid material men, subcontractors or suppliers has limited rights to sue the Government in this court.[2] Specifically, defendant argues that if the Government has retained funds earned by the contractor or still controls progress payments due the contractor, the court would have jurisdiction to entertain plaintiff's equitable subrogation claim directed at such funds. *See National Sur. Corp. v. United States,* 118 F.3d 1542, 1546 (Fed.Cir. 1997). Likewise, if the Government breaches its duties to the surety by making payments to others that more properly should have been made to the surety, the court would have jurisdiction to entertain the sureties' claim to such payment. *Id.* at 1546.

Defendant, however, maintains that plaintiff lacks standing to assert its claim because the contract was terminated at the beginning of contract performance—only one progress payment had been made to the contractor, no site work had occurred, the contractor never submitted any further progress payment requests to the Government, and the materials fabricated for the contract were never delivered to the contractor and never made it to the job site before the contract was terminated. Most importantly, the contractor was not due and owing any monies under contract. Under these circumstances, defendant argues, there are no contractor earned funds to which the surety can direct its equitable subrogation claim.

The Government is correct in stating that plaintiff has the burden of establishing jurisdiction. But the court has a duty to satisfy itself that it has jurisdiction. As indicated above, plaintiff's complaint sets forth a *prima facie* case for a surety's claim based on the doctrine of equitable subrogation. "[T]he surety's rights and obligations are not based on third-party beneficiary concepts, but on principles of suretyship law." *Id.* at 1545. The doctrine of subrogation is an important principle of suretyship law. *See Transamerica Premier Ins. Co. v. United States,* 32 Fed.Cl. 308, 311–12 (1994) (Court has jurisdiction to decide surety's subrogation claim).[3]

The Supreme Court has cautioned against granting motions to dismiss for lack of jurisdiction when the basis for the motions are more appropriately a challenge to plaintiff's statement of a claim for relief. In *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) the Supreme Court stated in pertinent part:

> Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for

---

2. Plaintiff's statement that "the surety's rights of equitable subrogation are extensive" (Plaintiff's moving brief p. 3) is not correct. For example, surety subrogation rights are inferior to the right of the United States to set off the amount of money owed it by the contractor against contract retainages in the hands of the Government. *Barrett v. United States,* 177 Ct.Cl. 380, 386–87, 367 F.2d 834, 838 (1966). Further, it is established suretyship law "that one cannot acquire by subrogation what another whose rights he claims did not have." *United States v. Munsey Trust Co.,* 332 U.S. 234, 242, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The surety may be

entitled to funds retained by the Government, but absent a claim by the contractor for an adjustment to the contract, the surety is not entitled to subrogation of the right of the contractor to seek an adjustment to the contract price for extra expenses incurred. *See Universal Sur. Co. v. United States,* 10 Cl.Ct. 794, 798–99 (1986).

3. *See also, Washington Int'l Ins. Co. v. United States,* 16 Cl.Ct. 663, 666, *aff'd,* 889 F.2d 1101 (Fed.Cir.1989) (Table) (Surety's claim against Government based on doctrine of subrogation denied on merits not on jurisdictional grounds).

relief, then dismissal of the case could be on the merits, not for want of jurisdiction.

Defendant's motion to dismiss plaintiff's complaint on jurisdictional grounds is denied.

-B-

On the merits, defendant also seeks dismissal of plaintiff's complaint under RCFC 12(b)(4) for failure to state a claim upon which relief may be granted. Since defendant has alternatively moved for summary judgment under RCFC 56(c) and plaintiff has likewise moved for summary judgment, both submitting materials in support thereof, the court believes it more appropriate to consider this case under summary judgment procedures rather than under RCFC 12(b)(4).[4] *See* RCFC 12(b).

Plaintiff's motion for summary judgment "is based primarily on its right of equitable subrogation." It is important to note that there was no separate takeover agreement between the Government and the surety under its Performance Bond. This fact serves to distinguish the language found in that line of surety subrogation cases from the line of payment bond cases, applicable to this case, which sometimes generates linguistic confusion in dealing with surety subrogation rights. *See Universal Sur. Co. v. United States*, 10 Cl.Ct. 794, 798 (1986). Plaintiff has paid, by way of settlement, the supplier of specified doors and frames for some 204 family housing units at Fort Rucker, after the contractor failed to pay the supplier. The payment to the supplier by plaintiff was pursuant to the Payment Bond which plaintiff issued to the contractor under the Miller Act 40 U.S.C. § 270 *et seq.* (1991).

By virtue of the above payment, plaintiff claims it is equitably subrogated to all rights of the supplier, the contractor and the Government. Plaintiff cites the following language in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) in support of its position:

We therefore hold ... that the Government had a right to use the retained funds to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights....

In *Barrett*, cited in footnote 2, the Court of Claims discussed the *Pearlman* case and observed "[I]t has been long and consistently held that laborers and materialmen do not have legally enforceable rights against the United States for this compensation (cases cited omitted). Their remedy is on the surety's payment bond in an action exclusively within the jurisdiction of the District Courts under the Miller Act." *Barrett*, 177 Ct.Cl. at 383, 367 F.2d 834.

In this court, plaintiff stands in the shoes of the contractor, not the shoes of the laborers and materialmen. *See United Elec. Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082, 1086 (1981) (where the Court of Claims gave a reasonable reading to "the somewhat ambiguous language [quoted above] in *Pearlman* "). To the extent the Government owes the contractor monies for contract performance, the surety, by paying suppliers and materialmen, is subrogated to the contractor's right to those funds. However, it is also settled that a subrogee (surety) cannot acquire by subrogation what another (contractor) whose rights he claims did not have. *Barrett*, 177 Ct.Cl. at 383, 367 F.2d at 836. Finally, the surety's right to subrogation arises only as to the monies due under the contract in question. *Stearns & Elder*, The Law of Suretyship § 11.13, p. 470

---

4. Dismissal under RCFC 12(b)(4) is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Further, dismissal under this Rule does not divest the court of jurisdiction and thus operates as a adjudication on the merits. Moreover, "[T]he issue [under this Rule] is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Id.* at 236, 94 S.Ct. 1683. *See also Kinne v. United States*, 21 Cl.Ct. 104, 107 (1990). Dismissing a complaint for failure to state a claim is rather severe since plaintiff would not receive an opportunity to offer evidence to prove its claim. *Id.* at 107.

(1972); see also, Dependable Ins. Co. v. United States, 846 F.2d 65, 67 (Fed.Cir.1988); Security Ins. Co. v. United States, 192 Ct.Cl. 754, 764, 428 F.2d 838, 844 (1970).

■ Plaintiff argues that having paid the supplier in April 1995, it is entitled to be paid out of the contract obligated funds existing at the time of the execution of the contract in September 1993.[5] The contract price was $406,619. Plaintiff had issued a payment bond to the contractor (WCC) on October 6, 1993. Only one progress payment was made to the contractor and plaintiff does not argue it was improperly made. The fact that the contract was terminated for default on February 17, 1994, plaintiff maintains, cannot defeat plaintiff's equitable right of subrogation to receive payment from the original contract obligated balance. Since plaintiff paid the legitimate claims of the supplier of the doors, plaintiff avers, it should be reimbursed by the Government for making these payments.

As viewed by plaintiff, the matter is simple and direct. Plaintiff ignores the fact that no contract funds were due and owing the contractor for work performed on the contract. Pearlman, relied on by plaintiff, involved "retained" funds, i.e., funds earned by the contractor but retained by the Government. Pearlman did not say a surety was entitled to be paid out of contract obligated funds or the contract fund balance existing at the time of termination of the contract. Likewise, Transamerica Premier Ins. Co. v. United States, 32 Fed.Cl. 308 (1994), relied on by plaintiff, involved the surety's right to "re-tained" funds, i.e., funds owed the contractor for work done on the contract. Again, Transamerica did not say a surety was entitled to be paid out of the contract obligated fund or the contract fund balance existing at the time the contract was terminated. In both Pearlman and Transamerica, the surety was entitled to recover funds which were due and owing the contractor but "retained" by the Government.[6] The problem with plaintiff's position is that the contractor (WCC) was paid for all work it performed by way of one progress payment at a time when plaintiff had no right of equitable subrogation, i.e., there was no obligation by the contractor or the surety to pay the suppliers. At the time of contract termination on February 17, 1994, the contractor was not due any monies from the Government since it had not performed any work on the contract which generated any right by WCC to payment from the Government. Too, the supplier (H & H) apparently had not completed its obligation under its purchase order from the contractor which entitled it to any monies from the contractor at time of the termination of the contract. Accordingly, there were no "retained funds" or progress payment for work performed by the contractor to which plaintiff's equitable right of subrogation could be directed. Plaintiff seeks to overcome this obstacle by focusing on the monies obligated for total contract performance of the contract or the existing contract obligated fund balance as of the date of contract termination as a target for its equitable subrogation claim. Plaintiff cites no case which supports such a novel proposition

---

5. The surety's right of subrogation relates back to the date of the execution of the surety bonds on October 6, 1993. National Sur. Corp., 118 F.3d at 1546. There is case law that holds where the surety and assignee or trustee in bankruptcy vie for "retained" funds held by the Government, the surety's right to those funds, in determining precedence between competing parties, relates back to the date of the execution of the bonds. No case has been cited and none has been found that holds that the subrogation rights of the surety apply to contract proceeds that have not been earned by the contractor and are thus not due and owing the contractor. Case law in this area involve only funds earned by the contractor but held by the Government or improperly dispersed by the Government in violation of the surety's subrogation rights. In the case at bar, the Gov-ernment did not hold any funds due and owing the contractor thus the contractor had no right to any contract funds before or after the termination of the contract on February 17, 1995.

6. If the Government, after notice of the surety's equitable rights, pays out "retained" funds, i.e., funds owed the contractor for work done, the surety would be entitled to recover on its claim despite the absence of "retained" funds in the physical control of the Government. The significant point here is that the funds at times material therein were due and owing the contractor. In the case at bar no contract funds at all times material herein, were due and owing the contractor. See Newark Ins. Co. v. United States, 144 Ct.Cl. 655, 658–59, 169 F.Supp. 955, 957 (1959).

and the court has been unable to find case precedent for such a position.[7]

Since the Government held no funds which were due and owing the contractor at any material time, in this case, plaintiff, standing in the shoes of the contractor, has no equitable subrogation right to obtain any funds from the Government relative to the contract in question. Accordingly, plaintiff's motion for summary judgement must be denied.

Defendant, in its motion for summary judgment, asserts that plaintiff, in order to assert a viable equitable subrogation claim against the Government, must first establish that the Government was acting as a stakeholder, and, second, that the plaintiff, as a surety, must be asserting the rights of the contractor to funds due and owing the contractor from the Government. Since there are no funds due and owing the contractor in the hands of the Government, defendant avers the Government cannot be deemed to be acting as a stakeholder and the plaintiff, as a surety, standing in the shoes of the contractor therefore has no right to funds to which it can be equitably subrogated. It seems obvious that where there are no monies due and owing the contractor the Government can hardly be considered a stakeholder. Generally, it is only when the Government has funds due and owing the contractor that it can easily be deemed a stakeholder.

There is case law, however, which suggests that the Government becomes a stakeholder when it receives timely notice from the surety that materialmen were making or threatening to make claims against the payment bond and asking the Government to retain any remaining funds due or due in the future pending settlement of unpaid job expenses. *See Home Indem. Co. v. United States*, 180 Ct.Cl. 173, 178, 376 F.2d 890, 893 (1967); *see also Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498–99 (Fed.Cir.1990) (only notice from surety counted, not information the Government might glean from other sources). In the case at bar, there is no evidence, nor is there even an allegation, that the surety sent a notice to the Government relative to claims by suppliers under its payment bond at any time from February 17, 1994, when the contract was terminated for default, to July 15, 1994, when the Army "de-obligated" the remaining contract balance of $397,987.[8]

The surety's failure to give notice of the claims of the supplier under the Payment Bond precludes considering the Government a stakeholder even if one disregards the established fact that the contractor was not due and owing any monies under the contract and even if one assumes, *arguendo*, that the contract balance, which was not earned or due the contractor, was in the hands of the Army, and deemed sufficient to brand the Government a "stakeholder," until it was de-obligated on July 15, 1994. *Hartford Fire Ins. Co. v. United States*, 40 Fed.Cl. 520, 523–524 (1998). There is no allegation in the com-

---

7. Plaintiff argues that if it stands in the shoes of the contractor, it is entitled to assert the contractor's right to convert the contractor's default termination into a termination for convenience. Under the termination clause, plaintiff reasons, it could recover the costs it paid the supplier of the doors. In fact, it is true the contractor did file suit in this court seeking to convert the default termination to one for convenience, but that suit, as indicated earlier, was settled by the contractor wherein the termination for convenience was granted but no monies were paid as a result of said settlement. Since the contractor received no monies as a result of this action, nor was it entitled to receive any monies, plaintiff, standing in the shoes of the contractor, likewise is not entitled to receive any monies by way of subrogation from the Government by viewing the matter though the prism of a termination for convenience. As indicated earlier, the surety is not entitled, in any event, to subrogation of the right of the contractor to seek an adjustment to the contract price. *See Universal Sur.*, 10 Cl.Ct. at 798–99. Further, "[T]he surety's rights and obligations are not based a third-party beneficiary concepts, but on principles of suretyship law." *National Sur. Corp.*, 118 F.3d at 1545.

8. The Army gave plaintiff, as surety, notice on February 9, 1994, that it was considering terminating the contractor for default for failure to comply with contractual requirements relative to insurance coverage. On February 10, 1994, plaintiff advised the Army it was unable to locate the contractor relative to the proposed default. The Army then provided plaintiff with the contractor's project manager's name and telephone number. Not hearing from the contractor or the surety, the Army terminated the contract on February 17, 1994. There is no evidence of the surety or the contractor contacting the Army on this matter prior to July 15, 1994.

plaint, nor any indication in the materials before the court that the "de-obligation" was anything but legal, proper under the circumstance and justifiable. It is presumed that public officials act in good faith. *Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959). The presumption stands unrebutted in this case.[9]

In its response to defendant's motion for summary judgment plaintiff contends that it has standing to assert a claim for an equitable adjustment against the Government. Plaintiff asserts this right not as a surety but on the basis of a General Agreement of Indemnity which the contractor and plaintiff executed when plaintiff issued the payment and performance bonds to the contractor. Plaintiff claims that the contractor, as security for issuance of the bond, assigned to plaintiff all rights, claims and causes of action which might arise from any bonded projects. Assuming the General Agreement of Indemnity supports such an assignment, such an assignment would appear to be invalid under the Assignment of Claims Act 41 U.S.C. § 15(a) (1988). The surety, under the circumstances of this case, is not considered to be a lending or financing institution as required by 41 U.S.C. § 15(e) nor does it so allege. *See George W. Kane, Inc. v. United States,* 26 Cl.Ct. 655 (1992). Plaintiff cannot claim standing under the Assignment of Claims Act. 31 U.S.C. § 3727, 41 U.S.C. § 15. *Kane,* 26 Cl.Ct. at 661. Further, the written notice of assignment required by 41 U.S.C. § 15(b)(3) was never filed with the contracting officer and/or the disbursing officer.

■ Finally, a surety is not permitted on the facts of this case, to step into the shoes of the contractor for the purpose of converting a default termination into a termination for convenience so as to make a contract claim, which it could not make under equitable subrogation, against the contract balance. *See Universal Sur. Co. v. United States,* 10 Cl.

Ct. 794, 799 (1986). Plaintiff's surety right under subrogation amounts to a security interest in the monies earned and due and owing the contractor pursuant to the contract. It does not give rise to an assignment of the contractor's legal status under the contract. *See Universal Sur. Co.,* 10 Cl.Ct. at 798–99, n. 2.

In its motion for summary judgment, plaintiff refers to the settlement agreement between the contractor and the Government wherein the Government agreed to convert the contractor's default termination into a termination for convenience and argues it is entitled to recover as termination costs, the costs it paid the supplier as surety under its payment bond. The flaw in this argument is that this same settlement agreement specifically provided that no costs whatsoever shall be paid to the contractor as a result thereof. Indeed, the conversion of the default termination to a termination for convenience, under the settlement agreement, "shall constitute an accord and a satisfaction of all claims" asserted in the litigation (Case No. 95–121C).

Defendant views plaintiff's argument as seeking to assert anew a claim for termination for convenience costs and challenges plaintiff's standing to assert such a claim in the face of the contractor's bankruptcy. At best, the unscheduled claim of the contractor remains the property of the bankruptcy estate, and thus the contractor does not have standing to bring a claim for his own benefit. *See Phoenix Petroleum Co. v. United States,* 40 Fed.Cl. 862, 865 (1998). As a result, the surety standing in the shoes of the contractor likewise has no standing to bring such a claim. Since the contractor is in bankruptcy only the trustee appointed to administer the Chapter 7 bankruptcy action would have standing to file suit on behalf of the contractor in order to pursue such a claim. *See* 11 U.S.C. § 323 (1993).[10] The court need not

---

**9.** Plaintiff's effort to denigrate the "de-obligation" of funds by use of the word "purportedly" in its brief does not serve to rebut the presumption. Further, summary judgment should not be denied on mere assertions or suggestive language in briefs by counsel; nor should such a motion be denied merely to satisfy counsel's speculative hope of finding some evidence that

might serve to save the complaint from dismissal. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984).

**10.** Plaintiff attempts to turn the tables on the Government by arguing that the settlement agreement between the Government and the contractor should be considered invalid since the

enter this thicket because this court, in recognition of the settlement agreement referred to above, dismissed the contractor's complaint with prejudice on March 25, 1996. That dismissal precludes, in any event, any further claim by the contractor/surety regarding the contract in question.

As might be expected, the doctrine of equitable subrogation has its roots in judicial concepts of fairness and equity. *See Transamerica Ins. Co. v. United States,* 989 F.2d 1188, 1194–95 (Fed.Cir.1993). Plaintiff claims that it seeks only what in equity and fairness should have been volunteered by Government, i.e., payment for the cost of materials, which the Government specified and required for the contract project. Plaintiff ignores the fact the Government never received the materials at the job site or otherwise and thus received no benefit at all. Rejecting plaintiff's claim will not result in a windfall for the Government, *See United Elec.,* 647 F.2d at 1087; *cf. United States Fidelity and Guaranty Co. v. United States,* 201 Ct.Cl. 1, 11, 475 F.2d 1377, 1383 (1973), but allowing plaintiff's claim would require the Government to pay for something it never received.[11] Plaintiff's bond premium takes into account, or should do so, the risks that the contractor might default early and that as a result the surety might have to absorb a loss on the bond arrangement. While the doctrine of equitable subrogation lessens some of the surety's risks in writing its bonds, the Government should not be considered an insurer of all plaintiff's risks. Plaintiff seems to contend the Government should have entered into a takeover agreement with the surety but the Government's reasons for not doing do so, a combination of economic and environmental considerations, cannot be viewed as unreasonable. The Government met all its obligations to the surety.[12]

■ The Government has not paid out any monies in violation of its obligations to the surety. *See Newark Ins. v. United States,* 144 Ct.Cl. 655, 658, 169 F.Supp. 955, 957 (1959); nor has the Government disbursed progress payments to the contractor after the surety had demanded the withholding of such payments. *See Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985); *see also Transamerica Premier Ins. Co. v. United States,* 32 Fed.Cl. 308, 316 (1994). Since the Government did not owe the contractor any money under the contract and was not holding any money due the contractor under the contract, the contractor at the time of default and thereafter, had no money claims against the Government under the contract. Since, under the doctrine of equitable subrogation—plaintiff's legal theory—plaintiff stands in the shoes of the contractor in this court, plaintiff likewise has no money claims against the Government. Again, it must be borne in mind that this case does not involve a takeover agreement with the surety.

■ Existing suretyship law clearly supports denial of plaintiff's attempt to enlarge the subrogation rights of the surety in this case. The funds obligated for contract performance but not earned by and therefore not due and owing to the contractor remained Government funds and thus were not subject to the equitable subrogation rights of the surety. *See Barrett,* 177 Ct.Cl. at 383, 367 F.2d at 836. If, as in *Barrett,* the Gov-

---

Trustee in bankruptcy was not a party to the settlement agreement. Plaintiff cites no case in support of its position. Even if one were to concede that the Trustee may well have standing to challenge the settlement, the lack of challenge by the Trustee does not serve to void or render invalid the settlement agreement vis-a-vis the parties to the settlement and those who stand in the shoes of the parties. Those parties are clearly bound by the settlement.

11. In addition to plaintiff's claim in the instant action to recover the monies it paid the supplier, plaintiff also has filed a claim in the District Court for the Northern District of Alabama against the contractor seeking to recover those same monies and has also asserted a claim as a creditor of the contractor in the contractor's bankruptcy action. Plaintiff may well receive some recovery in the Bankruptcy action.

12. The Government alerted the surety to the possibility of contractor default hoping that the surety might be able to convince the contractor to remedy the contractor's failure to meet contract requirements, and later gave the surety additional information when the surety was unable to locate the contractor. The Government did not retain, or improperly disburse, any monies due and owing the contractor under the contract for which the payment bond was issued.

ernment "has a right, superior to the rights of the surety, to apply funds in its hands to extinguish debts due the Government by the contractor from whom the funds are withheld," *a fortiori*, the Government in this case has the right, superior to the rights of the surety, to retain obligated Government funds not used in the performance of the contract and not due or owing the contractor.

## CONCLUSION

For reasons discussed above, Defendant's Motion to Dismiss and Plaintiff's Motion for Summary Judgment are **denied**. Defendant's Motion for Summary Judgment is **granted**. The clerk is directed to dismiss the complaint. No costs.