WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant,

No. 98–440C.

United States Court of Federal Claims.

May 22, 2002.

568

Michael R. Strauss, Great Neck, New York, attorney of record for plaintiff.

Allison A. Page, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

LYDON, Senior Judge.

Plaintiff acted as surety for a defaulted U.S. Coast Guard contractor. The complaint challenges a final decision of the contracting officer that plaintiff was liable to the Coast Guard, under its performance bond, in the amount of $160,338.12, plus interest. The United States answered the complaint with a counterclaim for "excess procurement costs" in the amount of $151,449.58, plus interest.[1]

---

1. The discrepancy between the amount determined by the contracting officer and the amount of defendant's counterclaim is explained in Note 8, *infra*.

The action is before the court on motions for summary judgment. For the reasons discussed hereinafter, the court grants defendant's motion for summary judgment and denies plaintiff's cross motion for summary judgment. Plaintiff's request for relief is denied and defendant is entitled to an award on its counterclaim in the amount of $151,449.58, plus interest.

### FACTS

On June 29, 1993, the U.S. Coast Guard ("Coast Guard") awarded contract number DTCGGI–93–3WK178 to M. Zanis Contracting Corporation ("Zanis"), in the amount of $440,000, for the waterfront rehabilitation of the Coast Guard facility at Eaton's Neck, New York. The contractor was to begin performance within 30 days and complete the contract within 200 days of the award—*i.e.*, by January 25, 1994. The "Eaton's Neck contract" incorporated the Davis–Bacon Act, 40 U.S.C. § 276a, which provides that laborers working on the job must be paid no less than the rates specified in the Department of Labor's ("DoL's") applicable wage determination, and that these rates must be appended to the contract and incorporated therein. In accordance with this requirement the Coast Guard incorporated Wage Determination N.Y. 930013 into the contract.

Section I of the contract also incorporated by reference various federal acquisition regulations ("FARs"),[2] including the following:

— FAR 52.222–7, Withholding of Funds (February 1988), which provides that—

The Contracting Officer shall, upon his or her own action or upon written request of an authorized representative of the Department of Labor, withhold or cause to be withheld from the Contractor under this contract or any other Federal contract with the same Prime Contractor, or any other federally assisted contract subject to Davis–Bacon prevailing wage requirements, which is held by the same Prime Contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the Contractor or any subcontractor the full amount of wages required by the contract. In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work, all or part of the wages required by the contract, the Contracting Officer may, after written notice to the Contractor, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

— FAR 52.232–5, Payments under Fixed–Price Construction Contracts (April 1989), which provides, in pertinent part, that—

(a) The Government shall pay the Contractor the contract price as provided in the contract.

(b) The Government shall make progress payments as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer. The Contractor shall furnish a breakdown of the total contract price showing the amount included therein for each principal category of the work, which shall substantiate the payment amount requested in order to provide a basis for determining progress payments, in such detail as requested by the Contracting Officer ....

. . . . .

(e) If the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the pay-

2. Among the regulations incorporated into the contract was 52.222–4, Contract Work Hours and Safety Standards Act [40 U.S.C. § 327–333]—Overtime Compensation (March 1986).

ment until satisfactory progress is achieved . . . .

. . . . .

(h) The Government shall pay the amount due the Contractor under this contract after—

(i) Completion and acceptance of all work . . . .

— FAR 52.232–27, Prompt Payment for Construction Contracts (April 1989), which provides, in pertinent part, that—

Notwithstanding any other payment terms in this contract, the Government will make invoice payments and contract financing payments under the terms and conditions specified in this clause. . . . .

(a) Invoice Payments. (1) For purposes of this clause, there are several types of invoice payments which may occur under this contract, as follows:

(i) Progress payments, if provided for elsewhere in this contract, based on Contracting Officer approval of the estimated amount and value of work or services performed, including payment for reaching milestones in any project:

(A) The due date for making such payments shall be 14 days after receipt of the payment request by the designated billing office.

On July 8, 1993, pursuant to the contract, Zanis furnished a performance bond in the amount of $440,000 and a payment bond in the amount of $220,000. Both bonds were obtained from Westchester Fire Insurance Company ("Westchester"), which issues performance and payment bonds for government contractors in accordance with the Miller Act, 40 U.S.C. § 270a(a)-(d).[3]

The contractor's performance lagged from the outset. As documented by the Coast Guard in its subsequent termination for default (dated June 15, 1994), Zanis "fail[ed] to furnish required submittals" during the summer of 1993, prompting a letter by the Coast Guard on July 26 and a cure notice on Sep-

tember 4. As a result, the Coast Guard did not issue Zanis a notice to proceed on the contract until September 11, 1993. The Coast Guard notified Zanis again on October 15 of its failure to furnish certain documents, and meetings were held on November 18 and December 16, 1993, to discuss the contractor's lack of progress. On January 19, 1994, the Coast Guard issued Zanis a notice of concern about its failure to make adequate progress on the contract and for "delinquent payrolls." At that time, just six days before the completion date set in the contract, the project was only 40% done. The Coast Guard agreed to accept a new construction schedule and completion date from Zanis.

On March 8, 1994, the Contracting Officer (CO) issued a second cure notice to Zanis, detailing "conditions which are endangering the performance of this contract." A copy of the notice was sent to Westchester. The cure notice discussed the contractor's failure to adhere to its progress schedule and directed Zanis to submit a revised progress schedule for completing the contract by May 1, 1994. For the first time Zanis was warned that if its performance did not improve the Coast Guard might terminate the contract for default. A bilateral modification (0001) was issued on March 15, 1994 which incorporated some additional work into the contract and definitized the time extension to May 1, 1994.

In a letter to the CO, dated April 6, 1994, the president of Concrete Flotation Systems, Inc., a supplier of the concrete floating system being installed at the Eaton's Neck project, memorialized a couple of telephone conversations the two had held, on January 23, 1994 and April 4, 1994, in which the supplier advised the CO that Zanis was late on its payments and had an outstanding indebtedness of $20,680.02. In the letter the supplier stated that:

A repeated series of weekly calls (prompted by information from others who had not been paid by Zanis) led to my informing you on January 23, 1994 of the payment

---

**3.** The Miller Act requires all prime contractors in federal construction contracts to post a performance bond, which ensures the completion of the contract, and a payment bond, which pro-

tects subcontractors and individuals furnishing labor and material for the contract. 40 U.S.C. § 270a(a)(1) and (2).

situation, which resulted in your letter of January 24, 1994 to Zanis wherein you reminded them of the FAR clause 52.222–7 Withholding of Funds.

We finally received a $10,000 check on February 20, 1994 .... On March 8th, after repeated calls, we received an additional $10,000 .....

.... I called you on Monday, April 4 to .... confirm we had not gotten any more money..... [W]e are enclosing .... an invoice date 4–6–94, showing a current balance of $20,680.02.

You also suggested that I consider contacting his bonding company to inform them of the situation. After much thought, we have decided to hold off since that could precipitate a panic button that might result in changing the course of this and others of Zanis' projects; exacerbating the situation rather then [*sic*] expediting it. And since you will be enforcing the FAR clause 52.222–7, we do have reasonable protection.

In a letter to Zanis's president on May 5, 1994, the CO advised that the contractor was being investigated for alleged Davis–Bacon Act violations. The CO wrote that:

On April 19, 1994, labor standards interviews were conducted on the [Eaton's Neck] contract (copies attached). The persons interviewed are employed by Harbor Clean, Inc. Two of the employees have stated that they are not being paid in accordance with Davis–Bacon wages as identified in the contract, and a third employee was not certain of his wage rate. Underpayment of stated wage rates in the contract is a violation of the Davis–Bacon Act as included in the contract on Page 14 of 47. In accordance with the FAR clause 52.222–7 Withholding of Funds (copy attached) as included in the contract on Page 14 of 47, the Contracting Officer is authorized to take such action as may be necessary to cause the suspension of any further payment, advance or guarantee of funds until such violations have ceased.

Also on May 5, 1994, the Coast Guard issued modification 0002 extending the contract completion date another month to June 1, 1994. Zanis was directed to furnish a re-

vised schedule by May 9, 1994, advising how the approved rate of progress on the contract would be regained. No such revised schedule was furnished by Zanis.

On May 23, 1994, the CO issued a show cause notice to Zanis advising it that the Coast Guard was "considering terminating [t]he subject contract for default in accordance with FAR 52.249–10 (Default–Fixed–Price Construction)." A copy of the notice was sent to Westchester. The show cause notice identified the contractor's failures to provide a revised progress schedule, make submittals for equipment and materials required under the contract, submit for reapproval materials either partially approved or disapproved, and provide a response to the CO's letter of May 5, 1994, concerning "discrepancies in hourly wages" (*i.e.*, alleged Davis–Bacon Act violations). Zanis was directed to respond within 10 days.

Zanis responded by letter on June 1, 1994, but did not address all of the points in the show cause notice. The contractor acknowledged that two critical items under the Eaton's Neck contract requiring fabrication (the jib crane and the fuel dispensing cabinets) had not even been ordered. Zanis presented a revised construction schedule and requested another time extension—until August 2, 1994—to complete the contract.

On June 7, 1994, the Government inspector and the CO approved the issuance of a progress payment to Zanis in the sum of $32,940.00 for work completed and accepted during the period of April 8, 1994 to May 24, 1994. This amount was reduced from the $42,821.00 requested by Zanis because of the Coast Guard's concern about the lagging pace of the work and unanswered questions about "previous payroll reports." With this progress payment the balance remaining on the Eaton's Neck contract stood at $203,651.00. The remaining balance included $26,261.00 of retainage.

On June 15, 1994, the Coast Guard issued Zanis a notice of termination for default. A copy of the notice was sent to Westchester. Zanis was informed that its response to the show cause notice, including the request for yet another extension, were "not acceptable."

As grounds for terminating the contract the Coast Guard listed Zanis's (1) "repeated lack of performance, failure to progress and, not pursuing the work with diligence to insure a timely completion by re-established dates," (2) "repeated failure to furnish required submittals as per contract specifications," (3) "repeated failure to directly superintend the work whereby directions are carried out. Specifically, failure to supervise recurring deficiencies in subcontractors' scheduling and performance," and (4) "repeated failure to ensure proper wage deficiencies are corrected."[4]

Over the next several months the Coast Guard and Westchester engaged in negotiations over the terms of a takeover agreement. Westchester located a potential company to complete the project, the Bartholomew Company ("Bartholomew") of Westbury, New York.

Meanwhile, on November 21, 1994, the Department of Labor informed the CO that DoL was concluding its investigation of Zanis's subcontractor, Harbor Clean Corporation ("Harbor Clean"), under the Davis–Bacon Act (and related acts), as well as the Contract Work Hours and Safety Standards Act ("CWHSSA"), and had identified "substantial monetary violations, resulting from the failure to pay the required prevailing wage rates." The back wages due were computed to be $69,105.12. DoL then requested that the CO, "in order to protect the interests of the Federal Government and the affected employees," withhold this sum from the contract payments due the prime contractor

pending completion of the DoL investigation. The CO complied with this request.

On December 22, 1994, the first draft of a surety takeover agreement for the Eaton's Neck contract was sent by Westchester's counsel to the CO. The draft agreement proposed that Bartholomew complete the project for a price of $320,000.00, and that the Coast Guard "pay the surety and the Completion Contractor the balance of the Contract price unpaid at the time of default." Thus, under the Westchester proposal $203,651.00 would be made available to Bartholomew for completion of the contract.

By letter dated January 12, 1995, the CO informed Westchester's counsel that the draft agreement was "acceptable to the Government *except for the amount of funds remaining available to the Surety.* This amount must reflect the withholding of funds in the amount of $69,105.12, as directed by the U.S. Department of Labor's letter to this office on 21 November 1994." (Emphasis added.) The CO further advised that "I have not received the approval from the Department of Labor to release the withholding." The CO then proposed that paragraph five of the draft takeover agreement be revised with the following language:

"WHEREAS, the Government has represented to the Surety that the original contract amount was $440,000.00, that to date the Government has paid $236,349.00 to the Contractor under the Contract, and that Contract funds remaining in the Contract as of this date, including retainage and unpaid earnings but excluding withholdings for labor violations ($69,105.12) is

4. During the period of the Eaton's Neck contract the Coast Guard had three other contracts with Zanis which were likewise poorly performed by the contractor, generated a series of cure notices, and were ultimately terminated for default. They included: (1) the "Connecticut River Contract" for the modernization of aids-to-navigation towers on the Connecticut River, in which the Coast Guard issued four cure notices and a show cause notice between October 1993 and January 1994 followed by a termination for default on March 2, 1994; (2) the "Sandy Hook Contract" for the rehabilitation of certain Coast Guard buildings in Sandy Hook, New Jersey, in which the Coast Guard issued four cure notices between August 1993 and April 1994 followed by a termination for default on May 24, 1994 (in the

fall of 1994 the Coast Guard entered into a surety takeover agreement with Westchester and APEGC, Inc. for the completion of the contract); and (3) the "Long Island Sound Contract" for the repair of various lighthouses of aids-to-navigation towers on Long Island Sound, in which the Coast Guard issued three cure notices between November 1993 and August 1994 followed by a termination for default on December 8, 1994. All of these contracts were, like the Eaton's Neck contract, administered by the Coast Guard's Civil Engineering Unit in Providence, Rhode Island. Two of the contracts—"Connecticut River" and "Long Island Sound"—had the same contracting officer (Frank Pfeifer) as the Eaton's Neck contract.

$134,545.88 which remain available for the work remaining to be performed on the Contract."

On January 25, 1995, Westchester's counsel responded to the CO by letter, claiming that Westchester had a priority right to the withheld $69,105.12 under the doctrine of equitable subrogation. "[A]ll of the remaining contract monies must be paid to Westchester," the letter continued, "regardless of any claims which may be filed by the Department of Labor." The CO answered on January 30, 1995 with a revised proposal that coupled the continued withholding of the $69,105.12 with a request for "an expedited advance ruling by the Comptroller General as to whether the DOL request for such withholdings takes priority over the Surety to the remaining contract funds." The Coast Guard and Westchester would agree to be bound by that ruling. Westchester rejected the proposal and transmitted yet another draft to the Coast Guard on February 10, 1995. It provided for payment of the entire $203,651.00 contract balance to Westchester for completion by Bartholomew and that Westchester would reimburse the Coast Guard up to $69,105.12 "[i]n the event the Comptroller General determines that the withholding of the labor violations takes priority over the Surety and such determination is judicially confirmed."

At that point the Coast Guard advised Westchester's counsel that it would not enter into a surety takeover agreement with Westchester. Instead, the Coast Guard decided to reprocure the remaining work under the Eaton's Neck contract and solicited proposals from several sources, including Bartholomew, in accordance with FAR 49.405. Four offers were received, ranging in price from $294,880.00 to $427,560.00. Bartholomew's bid was $320,000.00. The lowest bid was from K–T Marine, Inc. ("K–T Marine"), of Perth Amboy, New Jersey. Accordingly, the reprocurement contract was awarded to that company at a price of $294,880.00 on February 27, 1995.[5]

On February 27, 1995, the CO issued modification 0001 to the reprocurement contract. It provided that the funds allotted for the contract with Zanis, totalling $203,651.00, were reobligated and reassigned to the reprocurement contract with K–T Marine. It also provided that $69,105.12 of that total be withheld for DoL wage violations and addressed with a future modification.[6] K–T Marine completed work on the reprocurement contract and received final payment therefor in January 1996.

By letter dated January 23, 1997, the Department of Labor advised the CO that DoL had reached an agreement with Zanis's subcontractor, Harbor Clean, with respect to violations of the Davis–Bacon Act and the CWHSSA "allowing [DoL] to make restitution of $60,216.58 in back wages and fringe benefits for work performed on the [Eaton's Neck contract]."[7] The Coast Guard was requested to "release this sum to the General Accounting Office (GAO) for disbursement to the affected employees." As the wage violations totaled only $60,216.58, the CO was further advised that "you may now release $8,888.54 to the prime contractor [Zanis] which represents the balance of the $69,105.12 currently being withheld."

Pursuant to the DoL's request, the CO expedited the issuance of a check from the Coast Guard to the GAO in February 1997 for $60,216.58. Since $8,888.54 of the with-

---

**5.** The court notes that the contract price of K–T Marine's bid was $25,120.00 less than the bid submitted by Westchester's contractor, Bartholomew. So the Coast Guard's award of the reprocurement contract to K–T Marine had the effect of mitigating Westchester's costs, as surety, by that amount.

**6.** Westchester and/or its reinsurer incurred losses of $31,217.00 on the Eaton's Neck payment bond in satisfying the claims of Zanis's subcontractors and suppliers, as well as loss adjustment expenses exceeding $13,354.00 in connection with claims under the payment and performance bonds (consisting primarily of attorney's fees and associated expenses, such as photocopies, overnight delivery charges, and long distance telephone calls). Plaintiff does not contest its liability for those payments and expenses.

**7.** DoL had determined that the subcontractor failed to pay the prevailing wage rates to 19 of its employees in violation of the Davis–Bacon Act (total $58,060.42), and that it failed to pay six of its employees premium pay for overtime hours in violation of the Contract Work Hours and Safety Standards Act (total $2,156.16).

held funds were deobligated and made available to the prime contractor, the funds remaining from the Zanis contract to finance the reprocurement work by K–T Marine increased from $134,545.88 to $143,434.42. This figure was still $151,449.58 less than the cost of the reprocurement contract— $294,880.00.

On March 12, 1997, the contracting officer sent a letter to Westchester demanding payment, under the performance bond, for the excess costs incurred by the Coast Guard in completing the Eaton's Neck contract. Westchester did not respond within the 45–day period set by the CO. The CO thereupon issued a "Final Decision" on May 14, 1997, determining that the cost of the reprocurement contract with K–T Marine exceeded the funds available from the defaulted contract by $160,338.12 [8] and that Westchester, under the terms of its performance bond, was liable to the Government for that amount, plus accrued interest from March 12, 1997.

Westchester filed a complaint in this court on May 13, 1998, seeking a reversal of the contracting officer's decision and a ruling that the Coast Guard's demand for payment of $160,338.12 was erroneous as a matter of law. Westchester claimed that it was entitled to the entire unpaid balance of the Zanis contract at the time of default, $203,651.00 (i.e., without any offset for alleged Davis–Bacon Act and CWHSSA violations of the Zanis subcontractor), and that it was discharged from liability under the performance bond to the extent of $32,940.00, the amount of the last progress payment to Zanis, because the Coast Guard had already decided to terminate the contract for default. The Government filed a counterclaim on September 11, 1998, asserting that Westchester was liable on its performance bond for $151,-449.58—the excess costs the Coast Guard had to pay under the reprocurement contract. (This figure correctly accounted for the DoL's $8,888.54 reduction of identified Davis–Bacon Act and CWHSSA violations,

which the CO overlooked in his Final Decision).

The parties filed motions for summary judgment in December 1999 (defendant) and March 2000 (plaintiff). Proceedings were then stayed until the Federal Circuit confirmed in *Insurance Company of the West v. United States,* 243 F.3d 1367 (Fed.Cir. March 23, 2001), that the Court of Federal Claims has subject matter jurisdiction of a surety's subrogation claim against the United States ("[W]e conclude that a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States.") *Id.* at 1375. The court thereafter lifted the stay in this case. Briefing resumed and was completed in February 2002. Oral argument was held on April 17, 2002.[9]

## DISCUSSION

 A surety bond creates a three-party relationship in which the surety becomes liable for the debt or duty of the principal (in this case the contractor) to the third party obligee (in this case the Government). See *Insurance Co. of the West, supra,* 243 F.3d at 1370; *Balboa Insurance Company v. United States,* 775 F.2d 1158, 1160 (Fed.Cir.1985). A performance bond surety may discharge its obligation to the Government on a defaulted contract either by taking over and completing performance of the contract or, if it lets the Government reprocure the contract, by assuming liability for the costs of completion that exceed the original contract price. *Insurance Co. of the West,* 243 F.3d at 1370. "If the surety fails to perform, the Government can sue it on the bonds." *Id.* (quoting *Balboa,* 775 F.2d at 1160). Sureties can assert claims against the Government under the doctrine of equitable subrogation. *Insurance Co. of the West, id.* See also *Intercargo Insurance Co. v. United States,* 41 Fed.Cl. 449, 456 (1998), *aff'd* 215 F.3d 1348, 1999 WL 604193 (Fed.Cir.1999). When a surety takes over contract performance or

---

8. This figure neglected to account for the DoL's final determination that the violations of Davis–Bacon and the CWHSSA were $8,888.54 less than the amount originally estimated.

9. At the court's request the parties also submitted post-hearing briefs on the issue of whether interest should be granted on any award to the Government.

finances completion of the defaulted contract, it is subrogated to the contractor's rights against the Government under the contract. *Insurance Co. of the West, id.*

In the case at bar, it is undisputed that the cost of the Coast Guard's reprocurement contract with K–T Marine was $294,880.00 and that the remaining funds allotted to the Eaton's Neck contract at the time Zanis was terminated for default stood at $203,651.00. Ordinarily (assuming there were no disputes between the parties) the surety would be liable to the Government for the difference— *i.e.*, $91,229.00.

Westchester, however, asserts that this amount should be reduced by $32,940.00, the amount of the Coast Guard's last progress payment to Zanis on June 7, 1994. That payment was made with knowledge of the impending termination for default, plaintiff argues, and thus represented an abuse of discretion by the Coast Guard and a breach of its obligations to the surety. In plaintiff's view, therefore, Westchester owes just $58,293.00 on the performance bond. The Government rejects plaintiff's argument with respect to the last progress payment to Zanis. Moreover, it asserts that Westchester, as surety, is liable for another $60,216.58—the amount of contract funds set aside in 1994 that were ultimately paid to the employees of the subcontractor, Harbor Clean, in February 1997 for wage violations under Davis–Bacon and the CWHSSA. In defendant's view, therefore, Westchester's liability on its performance bond totals $151,449.58 ($91,-229.00 plus $60,216.58).

Thus, there are two payments at issue in this litigation—(1) the last progress payment to the defaulted contractor of $32,940.00 and (2) the payment of $60,216.58 to the GAO in settlement of the subcontractor's wage violations—and the question for determination by this court is whether plaintiff is liable to the Government, under its bonds, in the amount of $58,293.00 or $151,449.58 or some other figure in between.

The court has jurisdiction of plaintiff's action under the Tucker Act, 28 U.S.C. § 1491(a). The court has jurisdiction of defendant's counterclaim under 28 U.S.C. § 1503 ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court.") and 28 U.S.C. § 2508 ("Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff.....").

■ The parties assert that the court also has jurisdiction under the Contract Disputes Act, 41 U.S.C. § 609(a). Case law is clear, however, that only a performance bond surety that enters into a takeover agreement with the Government can bring an action in this court under the CDA. See *Universal Surety Co. v. United States*, 10 Cl.Ct. 794, 800 (1986); *Westech Corp. v. United States*, 20 Cl.Ct. 745, 749 (1990); *Johnson Controls World Services v. United States*, 44 Fed.Cl. 334, 340 (1999); *Admiralty Construction, Inc., by National American Insurance Co. v. Dalton*, 156 F.3d 1217, 1220–21 (Fed.Cir. 1998). The court does not discern any intention on the part of the Federal Circuit in *Insurance Co. of the West, supra*, to change the law of subrogation or overturn existing case law limiting this court's CDA jurisdiction to sureties that take over and complete the contract. Since Westchester did not take over and complete the Eaton's Neck contract, it did not establish privity of contract with the Government in respect to the construction contract and cannot maintain an action under the CDA. That lack of contractual privity also means that defendant's counterclaim is not a CDA action.

Summary judgment is appropriate when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Schuerman v. United States*, 30 Fed.Cl. 420, 434 (1994); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties do not dispute any material facts in this case and agree that the matter is ripe for summary judgment.

**576**

*The Progress Payment*

■ Defendant argues that plaintiff's claim with regard to the $32,940.00 progress payment to Zanis is precluded because Westchester failed to give the Coast Guard requisite notice of the contractor's default on its bonds and request that further progress payments be withheld. In support of this argument the Government leans heavily on the Federal Circuit's holding in *Fireman's Fund Insurance Co. v. United States,* 909 F.2d 495 (Fed.Cir.1990). That case involved a surety that did not notify the Government that the contractor was failing to pay its subcontractors and suppliers, or request that payments be withheld from the contractor, until five months after the Government had released the contract funds at issue. In ruling that the Government breached no duty to the surety, the Federal Circuit explained that:

> the government as obligee owes no equitable duty to a surety . . . . unless the surety *notifies* the government that the [contractor] has *defaulted under the bond.* It is irrelevant whether the surety claims a right to funds during the performance of the contract, or after it is completed when the government functions as a 'stakeholder' of funds owed but not yet paid. In either event, *notice by the surety is essential before any governmental duty exists.*

909 F.2d at 498 (emphasis added). In *Fireman's Fund* the Government had been informed by some subcontractors and suppliers, prior to release of the subject funds, that the contractor was not keeping up with its payment obligations. But that fact, in the court's view, "does not substitute for notice by the surety and *does not trigger the government's equitable duty to act with reasoned discretion* toward it." *Id.* at 499 (emphasis added). The court went on to explain that "Fireman's Fund simply cannot rely on [the] subcontractors *or the government* to protect its interests. By definition and agreement the surety protects the government's interest, not the other way around." *Id.* Returning to its salient point, the Federal Circuit emphasized that:

Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the [G]overnment owe it any duty. The surety knows best when this may occur; consequently, *only notice by the surety triggers the [G]overnment's equitable duty.*

*Id.* (emphasis added).

■ In the case at bar it is undisputed that Westchester did not notify the Coast Guard that Zanis was defaulting under the surety bonds or, even more importantly, request that the Coast Guard withhold the last progress payment. Quite the opposite, it was the Coast Guard that kept Westchester informed, by copying it on the second cure notice and the show cause notice, that Zanis's contract performance was deficient and needed to improve. So the surety knew just as much as the Government, and had every opportunity to give notice to the Coast Guard of any potential default by Zanis on the bonds and to request that further payments to the contractor be withheld. It did not do so.[10] Based on the Federal Circuit's ruling in *Fireman's Fund,* therefore, defendant maintains that "the Government's equitable duty to act with reasoned discretion" toward the surety was never triggered. The court agrees.

■ That does not mean, however, that the Government had no duty whatsoever to Westchester. The Federal Circuit also indicated in *Fireman's Fund* that a surety may have a valid claim against the Government, even if it did not give notice of the contractor's potential bond default, if the Government, in disbursing funds to the contractor, derogated from the governing contractual provisions and thereby caused injury to the surety. Thus, the Federal Circuit recited the following passage from the Claims Court's underlying decision: "It is well-settled in many jurisdictions that if the obligee departed from or altered the contractual provisions relating to payments and/or the secu-

---

**10.** At oral argument, in answer to the court's question as to why Westchester did not give notice to the Coast Guard of the contractor's default on the bonds or request that the Coast Guard withhold further progress payments to Zanis prior to the default, plaintiff's counsel stated that he had no idea why Westchester failed to take such action. (Transcript at 36.)

rity of retained funds, a surety is discharged from its obligations [though] only to the extent it can show injury, loss, or prejudice." 909 F.2d at 497 (quoting from *Fireman's Fund Ins. Co. v. United States*, 15 Cl.Ct. 225, 230 (1988)). In a more recent case, *National Surety Corp. v. United States*, 118 F.3d 1542 (Fed.Cir.1997), the Federal Circuit held in a similar vein that the failure of the performance bond surety to notify the Government of the contractor's default (knowledge of which the Government had in any event) did not defeat its subrogation right in retainage that was supposed to have been withheld under the construction contract. The court explained that "[a]s a general rule a surety will be discharged where the bonded contract has been altered or changed without the surety's knowledge or consent," providing the surety can show it was "prejudiced or damaged." 118 F.3d at 1546 (quoting *United States. v. Reliance Insurance Co.*, 799 F.2d 1382, 1385 (9th Cir.1986)).

■ As this case law indicates, the court must examine the Eaton's Neck contract at issue here to determine whether the Coast Guard, in making the last progress payment to Zanis, acted in accordance with its payment provisions. As previously outlined, the contract incorporated by reference certain FAR provisions governing payments to the contractor. Thus, FAR 52.232–5(b) provided that *"[t]he Government shall make progress payments as the work proceeds* .... on estimates of work accomplished *which meets the standards of quality established under the contract* ...." FAR 52.232–5(e) provided that "[i]f the Contracting Officer finds that *satisfactory progress* was achieved *during any period* for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made *in full.*" (Emphasis added.) If the contractor fell short of "satisfactory progress," however, the CO had the discretion to *"retain a maximum of 10 percent* of the amount of the payment until satisfactory progress is achieved ...." *Id.* (Emphasis added.) Furthermore, progress payments were to be made promptly. As specified in FAR 52.232–27(e), "[t]he *due date* for [progress] payments shall be *14 days after receipt* of the payment request ...." (Emphasis added.)

In reviewing the CO's last progress payment in this case, the court is persuaded that it comported with the foregoing contractual provisions. The invoice for the subject progress payment (the Coast Guard's seventh to Zanis under the Eaton's Neck contract) was signed and dated by the contractor's president on May 24, 1994. That was the day after the Coast Guard's show cause notice to Zanis (May 23, 1994) admonishing the contractor on a host of performance shortcomings, ordering a response within 10 days, and threatening to terminate the contract. The invoice was reviewed and signed by the Government Inspector on June 1, 1994. It was then submitted to the Contracting Officer and recorded as "received" on June 1, 1994, the same date that Zanis responded to the Coast Guard's show cause notice and requested a further extension until August 2, 1994, to complete the contract. The progress payment was approved (though not in the amount requested by Zanis) and issued on June 7, 1994—14 days after the invoice was prepared by Zanis and six days after its official receipt by the Contracting Officer, and thereby in accordance with the deadline set in FAR 52.232–27(e). Eight days later, on June 15, 1994, the Coast Guard terminated the contract for default.

Thus, the seventh progress payment to Zanis was being processed during the same period that the contractor was being given its last chance to improve its performance and complete the contract. It is unclear whether the Coast Guard had already decided by June 7, 1994—the date of the last progress payment—to terminate the contract, though it was probably moving in that direction since the contractor's June 1 response to the show cause notice was inadequate (as discussed thereafter by the CO in the default termination). But the work period covered by the seventh progress payment was April 8—May 24, 1994—*i.e.*, the month and a half prior to the show cause notice—and the record does not demonstrate that Zanis should have been denied the $32,940.00 it received for the work performed and accepted during that period. The contractor actually requested a progress payment of $42,821.00, but the CO reduced the payment by nearly $10,000.00 because

Zanis had not addressed "previous payroll reports" and was still far behind schedule. So the CO was clearly scrutinizing the contractor's performance closely, and he determined that the work completed in the seventh work period only warranted a payment of $32,940.00. Moreover, the CO withheld a 10 % retainage, in accordance with FAR 52.232–5(e), since Zanis had obviously not made "satisfactory progress" on the contract within the meaning of that provision. The progress payment recorded that the 10 % retainage of the "total allowances to date"— *i.e.,* since the commencement of the contract—now added up to $26,261.00.

The Coast Guard was required, under FAR 52.232–5(b), to make progress payments to the contractor for all work that met the "standards of quality established under the contract." There is little evidence that the quality of Zanis's work was a major factor in the Coast Guard's decision to terminate the contract. Though there are some fleeting references in the record to some deficiencies in work quality (the show cause notice, for example, referred to some "[d]isapproved items [that] have not been resubmitted, i.e. pipe/fittings, valves, secondary equipment," and the termination for default referred to Zanis's "failure to supervise recurring deficiencies in subcontractors' scheduling and *performance*" (emphasis added)), most of the Coast Guard's complaints focused on other shortcomings. They included the contractor's failure to keep up with required paperwork, late payments and underpayments to subcontractors, and repeated failure to maintain the contract schedule. Aside from the two brief quotations above, there is no other evidence in the record that the Coast Guard was dissatisfied with the quality of the work performed by Zanis. In particular, there was no assertion by the Coast Guard that Zanis failed to meet the "standards of quality established under the contract" for the work performed during the period April 8—May 24, 1994, and was therefore not entitled to a progress payment under FAR 52.232–5(b). Though Zanis failed to complete the contract, it did make slow progress and the Coast Guard was obligated to pay it for the work it performed.

The court finds, therefore, that the Coast Guard comported with its contractual obligations in making the seventh and last progress payment to Zanis. There is no evidence that the CO derogated from the terms of the Eaton's Neck contract in approving the progress payment of $32,940.00. Indeed, the CO took Zanis's under-performance into account, reducing the contractor's request by nearly $10,000.00, including a 10 % retainage because the contractor had not achieved "satisfactory progress" within the meaning of FAR 52.232–5(e). Westchester knew full well that Zanis was behind schedule and threatened with default at the time of the last progress payment, since the Coast Guard copied it on the cure notice to Zanis of March 8, 1994, and the show cause notice to Zanis of May 23, 1994. Yet Westchester did nothing, and to this day has offered no explanation for its inaction. The only logical conclusion the court can draw is that the surety, at the time the last progress payment was made, found nothing improper in it. As the Federal Circuit declared in *Fireman's Fund, supra,* "[the surety] simply cannot rely on .... the government to protect its interests..... [T]he surety protects the government's interest, not the other way around." 909 F.2d at 499.

While acknowledging that it did not satisfy the notice requirement discussed in *Fireman's Fund,* Westchester asserts that the final progress payment to Zanis on June 7, 1994, "presents a case of first impression" and that it is entitled to summary judgment based on the *prima facie* irrationality of the Coast Guard's release of the subject funds under the prevailing circumstances. Formal notice from the surety was unnecessary in this case, plaintiff argues, because the Coast Guard already had actual notice of Zanis's deficient performance under the Eaton's Neck contract, as well as three other contemporaneous contracts with the Coast Guard (see Note 4, *supra*). It is plaintiff's contention that where, as in the case at bar, the Coast Guard issued two cure notices and a show cause notice to the contractor, whose responses were repeatedly inadequate, and then issued a progress payment just eight days before terminating the contract for de-

fault, the Coast Guard acted, *ipso facto,* in derogation of its obligation to the surety.

The court does not agree that this is a case of first impression, that the Coast Guard acted irrationally, or that it breached any duty to Westchester. The progress payment issue falls squarely under controlling case law. Because Westchester did not give notice to the Coast Guard of Zanis's default on the surety bonds, and did not request that the last progress payment be withheld, it failed to "trigger the government's equitable duty to act with reasoned discretion toward it." *Fireman's Fund, supra,* 909 F.2d at 499. It is not the Government's responsibility, as the Federal Circuit made clear in *Fireman's Fund,* to divine the surety's thinking process, or to act as a nanny for the surety and ask it whether, under the circumstances of a given contract, it would like the Government to withhold progress payments to the contractor. Westchester was fully apprised of Zanis's performance record and the danger of its default on the Eaton's Neck contract (as well as the other three contemporaneous Coast Guard contracts in which it was acting as Zanis's surety) because it was copied on the Coast Guard's warning notices to Zanis. It was Westchester's responsibility to decide for itself what it wanted to do, if anything, with the information it received from the Coast Guard. It chose to do nothing, and it was not the Coast Guard's prerog-

ative or duty to substitute its judgment for the surety's.

Nor has Westchester demonstrated that the Coast Guard derogated from the terms of the Eaton's Neck contract in making the last progress payment to Zanis. So the surety cannot claim that it was discharged from its bond obligations. *Fireman's Fund,* 909 F.2d at 497; *National Surety, supra,* 118 F.3d at 1546.[11] Finally, based on the evidence of record as discussed above, the court does not view the last progress payment to Zanis as *"prima facie"* irrational, as plaintiff alleges, but rather as a valid and reasoned exercise of the contracting officer's authority under the contract. Indeed, if the Coast Guard's last progress payment were irrational, then Westchester's failure to take preventive action at the time (when it was just as well informed as the Coast Guard and could have requested the CO to withhold the payment) would be truly incomprehensible, and the surety would only have itself to blame.

Accordingly, plaintiff's claim that it should be discharged from liability under the performance bond for the amount of the Coast Guard's final progress payment to Zanis—$32,940.00—must be denied.

### Funds Disbursed to GAO for Payment of Wage Violations

■ The Davis–Bacon Act, 40 U.S.C. § 276a, was enacted to protect local wage

---

**11.** None of the case law discussed by plaintiff in its briefs presents enough factual similarity to the case at bar to offer a credible alternative to the controlling Federal Circuit rulings in *Fireman's Fund* and *National Surety.* For example, plaintiff cites *Balboa Insurance Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985), which articulated eight factors to consider in deciding whether the Government abused its duty to act with discretion toward the surety. 775 F.2d at 1164–65. But in *Balboa* the surety had given notice to the Government, so the Westchester situation is factually inapposite. In *United Pacific Insurance Co. v. United States,* 16 Cl.Ct. 555, 560 (1989), a pre-*Fireman's Fund* decision of the U.S. Claims Court which applied the *Balboa* factors even though the surety had failed to give notice, the Government was held to have abused its discretion by making a progress payment to the contractor for work that was not even begun, much less completed, in disregard of its equitable duty to the surety and in "gross violation of its own contract." This fact situation also diverges from

the case at bar, in which the amount of the last progress payment was based on work performed by the contractor and accepted by the Government during that pay period. In *International Fidelity Insurance Co. v. United States,* 41 Fed.Cl. 706, 713 (1998), the surety gave no notice to the Government of claims by subcontractors against its payment bond. But the Court of Federal Claims granted plaintiff an award for a payment made to the contractor because the Government had constructive notice from the surety, through the contractor, that future payments should go jointly to the surety and the contractor, had acted thereon to modify the construction contract making the surety and the contractor joint payees, but violated the contract nonetheless by making a payment directly to the contractor. That case is likewise factually distinct from the case at bar, though the ruling is fully consistent with *Fireman's Fund* and *National Surety* (because the Government violated the contract terms and was therefore liable to the surety).

standards by preventing contractors and sub-contractors in federal construction contracts from paying their workers less than the wages prevailing in the area where the contract is to be performed. See *Universities Research Association v. Coutu,* 450 U.S. 754, 773, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981). The Department of Labor is charged with determining the minimum wages applicable in a given locality. See *United States v. Binghamton Construction Company,* 347 U.S. 171, 176–77, 74 S.Ct. 438, 98 L.Ed. 594 (1954). The Act requires that every contract to which it applies contain the stipulation that "there may be withheld from the contractor so much of accrued payments as may be considered necessary by the contracting officer to pay [workers on the job] the difference between the rates of wages required by the contract .... and the rates of wages received ...." 40 U.S.C. § 276a(a). In addition, the Act mandates that every contract "shall contain the further provision that in the event the [CO determines a Davis–Bacon violation has occurred] the Government may terminate [the contractor's] right to proceed with the work .... and the contractor and his sureties shall be liable to the Government for any excess costs occasioned the Government thereby." 40 U.S.C. § 276a–1. Furthermore, the Comptroller General (GAO) is "authorized and directed to pay directly to [workers] from any accrued payments withheld under the terms of the contract any wages found to be due ...." 40 U.S.C. § 276a–2(a).

■ The Eaton's Neck contract between Zanis and the Coast Guard incorporated by reference the Davis–Bacon Act and FAR 52.222–7 (Withholding of Contract Funds). FAR 52.222–7 requires the CO to withhold funds from the prime contractor to pay any workers (whether employed by the prime or by subcontractors) who did not receive all of the wages they were due under the contract. The regulation provides, in pertinent part, that "[t]he Contracting Officer *shall* .... upon written request of an authorized representative of the Department of Labor, withhold .... from the Contractor .... accrued payments or advances .... to pay laborers and mechanics .... employed by the Contractor or any subcontractor the full amount

of wages required by the contract." (Emphasis added.) In accordance with this contract provision, the Department of Labor's Regional Administrator in New York, by letter dated November 21, 1994, advised the CO that DoL's investigation of alleged wage infractions by the Zanis subcontractor, Harbor Clean, commenced the previous spring, had "disclosed substantial monetary violations." (Def. Appendix at 76.) The CO was directed to withhold $69,105.12 "from contract payments due the prime contractor." *Id.* Thus, under the terms of the Eaton's Neck contract and FAR 52.222–7, the CO was obligated to withhold the subject funds from the prime contractor.

When the DoL's follow-up letter from the Acting Regional Administrator in Philadelphia, dated January 23, 1997, advised the CO that agreement had been reached with Harbor Clean that its workers were entitled to restitution of $60,216.58 for Davis–Bacon Act and CWHSSA violations, the CO was likewise obliged under the terms of the Eaton's Neck contract and FAR 52.222–7 to follow DoL's instruction to release that amount of the withheld funds to the GAO. The DoL noted that Zanis had been informed in a letter dated September 16, 1996, personally delivered on October 22, 1996, of the results of the investigation and the right to a hearing before a DoL administrative law judge. Since Zanis had not responded to the DoL letter, nor contested the DoL's findings before an ALJ, the Acting Regional Administrator advised that "[t]he investigation findings with respect to the prime contractor are therefore final." Once the GAO received the $60,216.58 from the CO, it was in turn obligated under 40 U.S.C. § 276a–2(a) to disburse those funds to the underpaid workers.

Plaintiff asserts that Westchester, as surety on the defaulted contract, was subrogated to the rights of the Coast Guard in the entire remaining balance of contract funds at the time of default ($203,651.00), which rights were superior to those of any other claimant, including the DoL. That means, in plaintiff's view, that Westchester's claim to the $60,216.58 withheld for Davis–Bacon Act and CWHSSA violations in November 1994, five months after Zanis's termination for default,

was superior to that of the Department of Labor and the underpaid Harbor Clean workers. Plaintiff characterizes the CO's release of the withheld funds to the GAO for disbursement to Harbor Clean's workers as a "voluntary payment" by the Coast Guard, which improperly depleted the funds remaining for completion of the Eaton's Neck contract. The Government, plaintiff argues, cannot rely on Westchester to "compensate the Coast Guard for its own error."

The court rejects plaintiff's argument. The central and controlling fact in this case is that the Eaton's Neck contract, incorporating the Davis–Bacon Act, specifically provided that the Coast Guard withhold payments to the contractor if any Davis–Bacon violations were committed, whether by the contractor itself or by a subcontractor. Wage shortfalls to workers on the contract were to be recompensed from the contract funds. The CO reminded Zanis of that in his letter on May 5, 1994, discussing the DoL's investigation of Harbor Clean. ("Underpayment of stated wage rates in the contract is a violation of the Davis–Bacon Act as included in the contract .... In accordance with FAR clause 52.222–7 .... the [CO] is authorized to .... cause the suspension of any further payment .... of funds until such violations have ceased." Pl. Appendix at 3.) When the DoL preliminarily established wage violations of $69,105.12 and ordered funds in that amount to be withheld from the contractor in November 1994, those funds were, by law and by contract, no longer available to the contractor (or the Coast Guard) to complete work on the Eaton's Neck project. Nor were the funds available to Westchester since, as this court stated in *Intercargo*, 41 Fed.Cl. at 457, a surety cannot acquire by subrogation rights that the contractor itself did not have.

The reprocurement contract issued to K–T Marine in February 1995 reflected this situation, and the superior rights of Harbor Clean's workers to the withheld funds. The Coast Guard indicated in the K–T Marine contract that the unpaid balance of the defaulted Zanis contract—$203,651.00—was "reobligated and reassigned to [the] new contract," but that "[f]unds in the amount of $69,105.12 .... are set aside for DOL .... violations..... This results in a balance of $134,545.88 under appropriation .... Additional funding in the amount of $160,338.12 .... are hereby obligated .... Contract total now reads $294,884.00." The $69,105.12 of withheld funds remained untouched while K–T Marine completed the Eaton's Neck project and was paid the full amount due under the reprocurement contract— $294,884.00. When the DoL subsequently reached an agreement with Harbor Clean to settle the wage violations in the original contract for $60,216.58, the residue of withheld funds—$8,888.54—was freed up for return to the defaulted contractor, Zanis. The $60,216.58 represented unpaid earnings of the subcontractor's workers, however, which were due and owing to them under the Davis–Bacon Act, the CWHSSA, and the Eaton's Neck contract.

So the Coast Guard's release of the $60,216.58 to the GAO (for disbursement to Harbor Clean's workers) was not a "voluntary" act, and was not done in error, because the rights of the DoL and the subcontractor's workers in the subject funds were superior to the Coast Guard's, the contractor's, and the contractor's subrogee, Westchester. Thus, it was immaterial whether plaintiff was subrogated to the rights of the Coast Guard or Zanis in the remaining balance of the contract. The rights of Harbor Clean's workers were superior to both with respect to the funds withheld for Davis–Bacon and CWHSSA violations. Accordingly, the subject funds were not available to the surety, whether as a subrogee of the contractor or of the Coast Guard. See *Unity Bank & Trust Company v. United States,* 5 Cl.Ct. 380, 384– 85 (1984), *aff'd* 756 F.2d 870 (Fed.Cir.1985);[12]

**12.** In *Unity Bank & Trust* the court held that the claims of the contractor's underpaid employees had priority over the claim of the contractor's assignee to contract funds withheld because of Davis–Bacon wage violations. The court restated the general rule, applicable to government contracts, that "an assignee acquires no greater rights than his assignor." 5 Cl.Ct. at 384. The same principle applies to a surety who, as a subrogee, "step[s] into the shoes of a government contractor" and thereby succeeds to all the contractor's rights and duties. *Insurance Co. of the*

*Reliance Insurance Company v. United States,* 27 Fed.Cl. 815, 828–29 (1993).

Furthermore, it is difficult to discern what difference it would make to Westchester if the court determined, *arguendo,* that the surety's right to the funds withheld for Davis–Bacon and CWHSSA violations *were* superior to any other claimant's. If the Coast Guard had released the $60,216.58 of withheld funds to Westchester, instead of to the GAO for disbursal to Harbor Clean's underpaid workers, then Westchester would have been liable to Harbor Clean's workers for the exact same amount—$60,216.58—out of its payment bond. The Davis–Bacon and CWHSSA violations were committed by Zanis's subcontractor prior to the termination for default, and Westchester was liable therefor under its payment bond. Thus, whichever of its surety bonds came into play, it is clear that Westchester could not escape responsibility for the wage violations of the defaulted contractor.

Plaintiff tries to make an issue of the fact that DoL ordered the CO to withhold contract funds five months after Zanis had been terminated for default, rather than during Zanis's performance of the contract. That is a distinction without legal significance. The wage violations were committed by a Zanis subcontractor during performance of the Eaton's Neck contract (the DoL's investigation had begun two months prior to the termination for default). So the funds were owed to the subcontractor's workers prior to the contractor's default. When the contractor defaulted the surety became responsible therefor (at the very least on its payment bond), even though it was not until five months later that the requisite funds were withheld and two full years later before the exact amount of liability was established.

Westchester asserts that the Coast Guard was required under FAR 49.404 and FAR 49.406 to make the entire contract balance at the time of default—*i.e.,* $203,651.00—available for the completion of the Eaton's Neck contract. The court does not agree. FAR

49.404, entitled "Surety-takeover agreements," reads in pertinent part as follows:

> Because of the surety's liability for damages resulting from the contractor's default, the surety has certain rights and interests in the completion of the contract work and application of any undisbursed funds .... [T]he surety may condition its offer of completion upon the execution by the Government of a takeover agreement fixing the surety's rights to payment from those funds .... The agreement shall provide for the surety to complete the work according to all the terms and conditions of the contract and for the Government to pay the surety the balance of the contract price unpaid at the time of default ....

By definition FAR 49.404 applies only to surety-takeover agreements. Westchester did not enter into a surety-takeover agreement with the Coast Guard for the Eaton's Neck contract. So FAR 49.404 does not apply in this case. As for FAR 49.406, entitled "Liquidation of liability," that regulation states, in pertinent part, as follows:

> The contract provides that the contractor and the surety are liable to the Government for resultant damages. The contracting officer shall use all retained percentages of progress payments previously made to the contractor and any progress payments due for work completed before the termination to liquidate the contractor's and the surety's liability to the Government. If the retained and unpaid amounts are insufficient, the contracting officer shall take steps to recover the additional sum from the contractor and the surety.

The record does not indicate that the contracting officer violated any part of this regulation. While there were no unpaid progress payments available at the time of default, retainages were, in fact, used to liquidate part of the contractor's and surety's liability to the Government. The subject regulation, moreover, must be read in conjunction with the "Withholding of Funds" regulation (FAR 52.222–7) incorporated by reference into the

---

*West,* 243 F.3d at 1369 and 1375; *Intercargo,* 41 Fed.Cl. at 457. If a contractor's right to proceeds withheld for Davis–Bacon wage violations is inferior to that of the underpaid workers, the surety's should be as well.

Eaton's Neck contract, which expressly directed the CO to withhold from the contractor "accrued payments or advances" in order to pay workers who failed to receive the prevailing wages mandated by the Davis–Bacon Act. As this court made clear in *Reliance, supra*, 27 Fed.Cl. at 828–29, a surety is not entitled to the use of contract funds that are set aside to pay for Davis–Bacon violations of the contractor or a subcontractor.[13]

Plaintiff cites a number of cases—including *Aetna Casualty & Surety Co. v. United States*, 845 F.2d 971, 974 (Fed.Cir.1988); *Dependable Insurance Company, Inc. v. United States*, 846 F.2d 65, 67 (Fed.Cir.1988); *International Fidelity Insurance Co. v. United States*, 27 Fed.Cl. 107, 109 (1992); *Morrison Assurance Company, Inc. v. United States*, 3 Cl.Ct. 626, 634 (1983); and *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377, 1383 (1973)—in which the performance bond surety's rights to retained contract funds were held to be superior to the rights of the Government in the funds. But those cases are factually inapposite because they dealt with federal income tax obligations of the contractor, not underpaid workers on the contract at issue. The rulings all stated that the surety's claim to contract funds for the purpose of completing the contract took precedence over a claim of the Internal Revenue Service against the contractor for unpaid taxes, because the IRS claims were unconnected to the contract.

In the case at bar, the Government's claim to the withheld funds was directly connected to the Eaton's Neck contract. The Department of Labor did not assert a right to the $60,216.58 on its own behalf, but rather on behalf of a subcontractor's workers shortchanged on their wages in violation of Davis–Bacon and the CWHSSA. The prime contractor, Zanis, was liable for those wage deficiencies under the terms of its contract with the Coast Guard. When Zanis defaulted Westchester stepped into the shoes of the

delinquent contractor and assumed its contract obligations. So the claim of the DoL to the $60,216.58 of withheld funds, for the benefit of Harbor Clean's underpaid workers, was superior to the claim of Westchester to use those funds to pay the reprocurement contractor, K–T Marine. Had Westchester entered into a surety takeover agreement with the Coast Guard, it could not have avoided using the funds to pay Harbor Clean's workers in any event because the amount represented an outstanding legal and contractual obligation of the prime contractor. That was the sticking point in the negotiations for a surety takeover agreement and the reason for the parties' failure to enter into any such agreement. Westchester cannot achieve a result in this litigation that it had no legal grounds to demand from the Coast Guard in 1995.

In the final analysis, the contractual obligations Westchester undertook when it issued its surety bonds to Zanis preclude it from asserting a superior right to the contract funds withheld by the Coast Guard to recompense Harbor Clean's workers for Davis–Bacon and CWHSSA violations. By law and by contract, the claims of the subcontractor's workers to the subject funds took priority over Westchester's claim thereto as the performance bond surety. Plaintiff's claim for the $60,216.58 must therefore be denied.

### *United States Counterclaim*

For the reasons discussed above, the court finds that plaintiff is not entitled to reduce its liability to defendant, under its surety bonds, by either (1) the $32,940.00 paid by the Coast Guard to Zanis as the last progress payment or (2) the $60,216.58 withheld by the Coast Guard at the DoL's direction and then released to the GAO to satisfy the Davis–Bacon and CWHSSA claims of Harbor Clean's workers. Plaintiff is liable to defendant for

---

**13.** Plaintiff discusses a couple of old Comptroller General (GAO) decisions, 46 Comp.Gen. 178 (1966) and 52 Comp.Gen. 633 (1973), which allegedly stand for the proposition that the Government's right to use remaining contract funds to complete the contract is superior to the Davis–Bacon claims of the contractor's employees, and that the surety is equitably subrogated to the

Government's superior right. Those cases, in addition to their factual distinctions from the case at bar, have no precedential weight in this court. Nor do they have any persuasive value, considering the later case law in this court (*Unity Bank & Trust* and *Reliance, supra*) holding that employees' Davis–Bacon wage claims have priority over other claims to the use of contract funds.

both those amounts, plus the additional re-procurement costs of $58,293.00, previously mentioned, that the parties do not contest. Thus, defendant is entitled to an award on its counterclaim in the principal amount of $151,449.58, which represents the total excess costs incurred by the Coast Guard in reprocuring and completing the Eaton's Neck contract.

### Interest

■■■ The court raised the question of interest at oral argument, *sua sponte*, requesting supplemental briefing from the parties on the question of whether the Government is entitled to interest on an award. In its brief plaintiff asserted, as an initial matter, that neither 28 U.S.C. § 1503 nor 28 U.S.C. § 2508, which give this court jurisdiction of the Government's counterclaim, mentions interest. That contention is true, but not dispositive. As defendant correctly observed in its brief, the old Court of Claims exercised its own discretion in deciding, on a case by case basis, whether to grant the Government interest on a counterclaim award. The court typically denied interest to the Government on the ground that contractors suing the Government, as a general rule, were not entitled to interest on their awards. See *Stoeckert v. United States*, 183 Ct.Cl. 152, 391 F.2d 639, 648 (1968); *Astro–Space Laboratories, Inc. v. United States*, 200 Ct.Cl. 282, 470 F.2d 1003, 1020 (1972); *Ubique Ltd. v. United States*, 1980 WL 20807 at *6 (Ct.Cl. Trial Div.1980).[14]

The legal situation changed following the enactment of the Contract Disputes Act of 1978, which since 1979 has allowed contrac-tors covered by the CDA to collect interest on awards against the Government. 41 U.S.C. § 611 (1994). Congress subsequently enacted the Debt Collection Act of 1982, P.L. 97–365, 96 Stat. 1749, codified at 31 U.S.C. § 3701, 3711, 3716–19 (1994 & Supp. V 1999), broad corollary legislation that provided for the payment of interest on debts owed to the Government.[15] The statute states, in pertinent part, that:

> The head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12–month period ending on September 30 of each new year, rounded to the nearest whole percentage point.

> The Secretary may change the rate of interest for a calendar quarter if the average investment rate for the 12–month period ending at the close of the prior calendar quarter, rounded to the nearest whole percentage point, is more or less than the existing published rate by 2 percentage points.

31 U.S.C. § 3717(a)(1) and (2). The foregoing clause is qualified by the following provision:

> This section does not apply if a statute, regulation required by statute, loan agreement, or *contract* prohibits charging interest or assessing charges or *explicitly fixes the interest* or charges.

31 U.S.C. § 3717(g)(1) (emphasis added). Thus, the Debt Collection established a

---

14. Court of Claims practice diverged from the common law rulings of other federal courts, which recognized the "longstanding rule that parties owing debts to the Federal Government must pay prejudgment interest where the underlying claim is a contractual obligation to pay money." *United States v. Texas*, 507 U.S. 529, 533, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), quoting *West Virginia v. United States*, 479 U.S. 305, 310, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987). See also *Royal Indemnity Co. v. United States*, 313 U.S. 289, 295–297, 61 S.Ct. 995, 85 L.Ed. 1361 (1941).

15. As defined in 31 U.S.C. § 3701(b)(1), "the term 'claim' or 'debt' means any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency. A claim includes, without limitation .... (D) any amount the United States is authorized by statute to collect for the benefit of any person .... (G) other amounts of money or property owed to the Government." 31 U.S.C. § 3701(d) also specifies that the interest provisions of the Act "do not apply to a claim or debt under .... (1) the Internal Revenue Code of 1986 .... (2) the Social Security Act .... [in most cases] or (3) the tariff laws of the United States."

methodology for determining the rate of interest applicable for debts to the Government, and mandated that it be paid unless a statute, regulation or contract provided otherwise (either by prohibiting interest or fixing an alternative rate).[16]

Defendant asserts that the Government is entitled to interest on its award in accordance with an explicit clause of the Eaton's Neck contract. The clause at issue is one of the federal acquisition regulations incorporated by reference ("with the same force and effect as if they were given in full text") in Section I of the contract. The subject regulation—FAR 52.232-17 (Jan.1991), entitled "Interest"—states in pertinent part that:

(a)....all amounts....that become payable by the Contractor to the Government under this contract....shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978....

As further provided in section (b), interest begins to run from the date of the first written demand for payment. FAR 52.232-17(b).

Westchester, of course, was not a party to the Eaton's Neck contract. According to the plaintiff, that fact insulates Westchester from the application of FAR 52.232-17 and any liability for interest charges under the contract. As the surety for the contracting parties, however, Westchester was liable for amounts owed by the contractor to the Government. The performance bond specifically provided that:

the Principal and Surety....are firmly bound to the United States....in the above penal sum [$440,000.00]. ....[T]he Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown [$440,000.00]. ... The above obligation is void if the Principal....per-

forms and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract....

Similarly, the payment bond provided that:

the Principal and Surety....are firmly bound to the United States....in the above penal sum [$220,000.00]. ... [T]he Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown [$220,000.00]. .... The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work....

Because Zanis did not fulfill either its contractual undertakings to the Coast Guard or its payment obligations to Harbor Clean's underpaid workers, Westchester's bond obligations were never voided. Accordingly, Westchester remained liable for the excess costs incurred by the Coast Guard in completing the Eaton's Neck contract, as determined by the contracting officer in 1997.

In his letter to Westchester, dated March 12, 1997, the contracting officer informed the surety that it owed the Government $160,338.12 under its performance bond. When Westchester failed to respond to the letter, the CO issued a "final decision" on May 14, 1997, demanding payment from Westchester in the principal amount of $160,338.12, plus interest from March 12, 1997 until paid. The addition of interest to the principal sum accorded with the regulation incorporated into the Eaton's Neck contract (FAR 52.232-17), which provided that simple interest was to accrue if amounts "payable by the contractor" were not satisfied within 30 days after becoming due. That interest was owed by Westchester since it was bound "jointly and severally" with Zanis under the performance bond and Zanis had defaulted on the contract.

**16.** Since the Debt Collection Act of 1982 only applied to contracts executed after the date of enactment (October 25, 1982), this court has continued to exercise its traditional discretion, when dealing with contracts predating the Act, to decide on a case by case basis whether the Government should receive interest on an award.

See *Tester Corp. v. United States,* 1 Cl.Ct. 368 (1983); *Kordick and Son, Inc. v. United States,* 12 Cl.Ct. 662, 670–71 (1987); *Seaboard Lumber Co. v. United States,* 48 Fed.Cl. 814, 836–37 (2001). Contra *Spandome Corp. v. United States,* 32 Fed. Cl. 626, 636 (1995).

To avoid owing any interest Westchester should have discharged its duty as surety on the Eaton's Neck contract by paying the amount requested by the CO in his initial letter of March 12, 1997. Westchester could then have filed a claim with the CO challenging the amount it was charged and seeking compensation for the specific sums it challenged—*i.e.*, the last progress payment to Zanis of $32,940.00 and the $69,105.12 paid to the GAO for disbursal to Harbor Clean's workers. Westchester would likely have gotten immediate restitution from the CO of $8,888.54 (the amount of overpayment due to the CO's computational error in calculating the sum payable to the GAO for disbursal to Harbor Clean's workers). If the CO's final decision had denied Westchester any further relief, the surety had the right to file suit in this court, as it did. Even if Westchester lost its administrative and court actions seeking compensation for the remainder of its bill—totaling $151,449.58—it would at least have spared itself any interest because the debt would have been paid in full when it became due.

By not honoring the Coast Guard's demand for payment under the performance bond in 1997, Westchester was enriched by $151,449.58 and had the use of that money during the intervening five years. In effect, the surety has benefitted by the non-payment of its performance bond obligation and the Government has been injured in the same amount by not having the use of the money the surety was obligated to pay. To compensate the Government for the delay in receiving the money it was due five years ago, Westchester must pay interest to the Government, in accordance with the terms of the Eaton's Neck contract and its duties as the surety thereof. That interest, as the contract specifies, shall be simple interest calculated from the date due until the date paid at a rate established according to Section 12 of the Contract Disputes Act of 1978. As the CO indicated in his final decision of May 14, 1997, the "date due" for Westchester's performance bond payment was March 12, 1997 (the date of the Coast Guard's first written demand, as specified in FAR 52.232–17(b)). So interest shall be calculated from that date to the present.[17]

Despite the clarity of the contract, the FAR provision, and the CO's final decision, the plaintiff inexplicably asserts that "the Government fails to articulate the commencement date for its claim of interest." (Pl. Supp. Br. at 3.) As the court just recounted in the foregoing paragraph, however, the commencement date for the calculation of interest—March 12, 1997—is precisely defined and documented. The plaintiff also complains that "the Government has failed to provide the Court with the applicable interest rates." *Id.* This is a specious argument

17. This ruling, in addition to comporting with the pertinent provisions of the Debt Collection Act, 31 U.S.C. § 3717(a)(1) and (g)(1), and the terms of the Eaton's Neck contract, is consistent with the Supreme Court's holding in *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941). In that case a taxpayer obtained a bond from the surety, which was given to the Internal Revenue Service to secure the payment of additional income taxes that were assessed by the IRS, but withheld and contested by the taxpayer. The bond obligated the surety to pay interest on the principal amount should the taxpayer's abatement claim be denied. When it was subsequently determined that the taxpayer did owe some additional taxes, the IRS demanded the additional principal amount, plus accrued interest. Royal Indemnity paid only the principal amount to the IRS, however, and the United States sued the surety on the bond. The Supreme Court ruled that Royal Indemnity was also liable for accrued interest (calculated from the original due date until the date of payment)—*i.e.*, not only the original amount of interest demanded by the IRS, but additional interest that accrued during the litigation—because "the bond was conditioned on the payment of the taxes with interest." *Id.* at 294, 61 S.Ct. 995. The Court explained that:

> [the surety's] obligation was contractual to pay an amount found to be due from the taxpayer and the suit against it is for a debt *ex contractu*, due and owing in conformity to the terms of the bond. [Citations omitted.] .... A suit upon a contractual obligation to pay money at a fixed or ascertainable time is a suit to recover damage for its breach, including both the principal amount and interest by way of damage for delay in payment of the principal after the due date.

*Id.* at 295–96, 61 S.Ct. 995. The Government's position is just as strong in the case at bar because the underlying construction contract specifically provided for the payment of interest to the Coast Guard on all amounts payable by the contractor, and the performance bond made the surety specifically liable for all unfulfilled contractual obligations of Zanis up to $440,000.00.

because the interest provision in the Eaton's Neck contract specifies how interest is to be determined: "The interest rate shall be established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 ...." Section 12 of the CDA (which technically applies to interest due *contractors,* calculated from the date the CO receives the claim to the date of payment) provides as follows:

> The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.

41 U.S.C. § 611 (1994). In accordance with the foregoing contractual and statutory language, the court determines that defendant is entitled to interest at the CDA rate from March 12, 1997, the date the contracting officer advised Westchester by letter of its liability to the Government under the performance bond, until the date the judgment in this action is paid.

### CONCLUSION

In accordance with the foregoing discussion, defendant's motion for summary judgment is hereby GRANTED. Plaintiff's cross motion for summary judgment is hereby DENIED.

The clerk is ordered to (1) enter JUDGMENT for defendant on its counterclaim in the amount of $151,449.58, plus interest calculated in accordance with Section 12 of the Contract Disputes Act of 1978 from March 12, 1997 to the date of payment, and (2) DISMISS plaintiff's complaint.

Each party shall bear its own costs.